## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re** | § | **Chapter 11** |
| | § | |
| **MATRA PETROLEUM U.S.A., INC.** *et al.* [1] | § | **Case No. 19-34190 (DRJ)** |
| | § | |
| **Debtors.** | § | **(Joint Administration Requested)** |
| | § | |

## DEBTORS' EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL AND OTHER COLLATERAL AND GRANT ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364; (B) UPON ENTRY OF A FINAL ORDER, ENTER INTO A DEBTOR-IN-POSSESSION FINANCING FACILITY; (C) SCHEDULE FINAL HEARING PURSUANT TO RULES 4001(B), 4001(C) AND 9014; AND (D) GRANT RELATED RELIEF

---

### NOTICE PURSUANT TO LOCAL RULE 9013-1

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Matra Petroleum USA, Inc. (4467); Matra Petroleum Operating, LLC (0145); Matra Petroleum Oil & Gas, LLC (5096); and Matra Terra, LLC 9069). The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 708 Main Street, Floor 9, Houston, TX 77002.

Matra Petroleum USA, Inc., Matra Petroleum Operating, LLC, Matra Petroleum Oil & Gas, LLC, and Matra Terra, LLC (collectively the "**Debtors**"), debtors and debtors-in-possession, file this *Emergency Motion of Debtors and Debtors In Possession For Interim and Final Orders Authorizing Debtors to (A) Use Cash Collateral and Other Collateral and Grant Adequate Protection to Prepetition Secured Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364; (B) Upon Entry of A Final Order, Enter Into A Debtor-In-Possession Financing Facility; (C) Schedule Final Hearing Pursuant to Rules 4001(B), 4001(C) and 9014; and (D) Grant Related Relief* (the "**Motion**") and in support thereof would respectfully show the Court as follows:

## RELIEF REQUESTED

1.      The Debtors seek entry of interim and final orders:

   a.   Authorizing the Debtors use the Cash Collateral;

   b.   Granting adequate protection to the Prepetition Secured Lenders;

   c.   Scheduling a final hearing (the "**Final Hearing**") no later than August 30, 2019; and

   d.   granting related relief.

2.      In support of this Motion, the Debtors incorporate the Declaration of Drew McManigle, Chief Restructuring Officer of Matra Petroleum USA, Inc. et al, in Support of Chapter 11 Petitions and First Day Motions (the "**Declaration**") filed contemporaneously with this Motion.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157 (b).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 361, 362, 363, 507, and 552 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Federal Rules

of Bankruptcy Procedure ("**Bankruptcy Rule**") 2002 and 4001, and rules 4002-1 and 9013-1 of

the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

**SUMMARY OF MATERIAL TERMS OF PROPOSED INTERIM ORDER**

6.      The following chart contains a summary of the material terms of the proposed

Interim Order authorizing use of cash collateral:

| Summary of Material Terms | |
| --- | --- |
| **Purposes for Use of Cash Collateral** | To enable the Debtors to continue to operate their businesses and preserve and maximize the value of the estates, during the period from the entry of the Interim Order until the earlier of the entry of the Final Order or the Termination Date (as defined below), the Debtors are hereby authorized to use Cash Collateral in accordance with the Budget, subject to the Permitted Variance (as defined below), and the other provisions of the Interim Order.  Following entry of the Final Order, the Debtors' authority to use further Cash Collateral will be governed by the terms of the Final Order. |
| **Budget** | The Debtors' use of Cash Collateral shall be in accordance with the Interim Budget, attached as **Exhibit A**, *provided, however* that with respect to each line item in the Interim Budget, the Debtors may use Cash Collateral in excess of that set forth in the Budget for that particular line item for each Budget Period so long as the percentage variance  for all line items shall not exceed ten percent (10%), in the aggregate, of the amount set forth in the Budget for all line items for such Budget Period. |
| **Adequate Protection** | The Debtors will provide adequate protection to the Prepetition Agents, for the benefit of the Prepetition Lenders as follows:<br>    (a)  Continuing and Replacement Liens.  To the Prepetition Agents, for the benefit of the Prepetition Lenders, in the form of replacement or, if applicable, new continuing liens and security interests in the Prepetition Collateral, including Cash Collateral (regardless of which Debtor's account holds such Cash Collateral) to the same extent, type and priority such Prepetition Agent, on behalf of the Prepetition Lenders, held as of the Petition Date, including new or continuing liens on proceeds, products, offspring, or profits of such Prepetition Collateral as set forth in section 552(b) of the Bankruptcy Code.<br>    (b)  Adequate Protection Liens. To the extent there is a diminution in value of the interests of the Prepetition Lenders in the Prepetition |

| Summary of Material Terms | |
|---|---|
| | Collateral (including Cash Collateral) from and after the Petition Date, each Prepetition Agent, for the benefit of the respective Prepetition Lenders, is hereby granted, subject to the terms and conditions set forth in the Interim Order, pursuant to sections 361, 363(e) and 364 of the Bankruptcy Code, replacement liens upon all Prepetition Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions, whether received by judgment, settlement or otherwise (such adequate protection replacement lien, the "**Adequate Protection Liens**"), which Adequate Protection Liens shall be subject and subordinate to any DIP Liens (if granted under the Final Order) and the Carve-Out.<br><br>(c) <u>Adequate Protection Claims</u>. To the extent of any diminution in value of their respective Prepetition Collateral from and after the Petition Date (including Cash Collateral), the Prepetition Agents, on behalf of the Prepetition Lenders, are hereby further granted allowed superpriority administrative claims (such claims, the "**Adequate Protection Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, junior only to the DIP Claims, if later approved, and the Carve-Out to the extent provided herein, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions, whether received by judgment, settlement, or otherwise); *provided that* the Prepetition Agents or Prepetition Lenders shall not receive or retain any payments, property, or other amounts in respect of the Adequate Protection Claims unless and until all DIP Claims (if any) have been paid in full. |
| **Priority of Adequate Protection Liens and Adequate Protection Claims** | Subject to the Carve-Out and the DIP Liens (if granted under the Final Order) and DIP Claims (if granted under the Final Order), the Adequate Protection Liens and Adequate Protection Claims shall be pari passu with each other and allowed and enforceable against each Debtor and its estates on a joint and several basis, *provided that* (a) Adequate Protection Liens and Adequate Protection Claims benefitting the U.S.A. Prepetition Agent and the U.S.A. Lenders shall |

| Summary of Material Terms | |
|---|---|
| | have priority over any other Adequate Protection Liens and Adequate Protection Claims as against Matra U.S.A. and the Prepetition U.S.A. Collateral, (b) Adequate Protection Liens and Adequate Protection Claims benefitting the Matra Terra Prepetition Agent and the Matra Terra Lenders shall have priority over any other Adequate Protection Liens and Adequate Protection Claims as against Matra Terra and the Prepetition Matra Terra Collateral, and (c) Adequate Protection Liens and Adequate Protection Claims benefitting the Matra O&G Prepetition Agent and the Matra O&G Lenders shall have priority over any other Adequate Protection Liens and Adequate Protection Claims as against Matra O&G and the Prepetition Matra O&G Collateral. |
| **Termination Date** | The Debtors' right to use the Cash Collateral shall terminate (the date of any such termination, "**Termination Date**") without further notice or court proceeding on the earlier to occur of (a) August 30, 2019 (the "**Expiration Date**"), (b) the date the Interim Order ceases to be in full force and effect for any reason; (c) entry of an order of (i) confirmation of any plan of reorganization, or (i) consummation of a sale of substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code; (d) dismissal of one or more of the Cases or the conversion of one or more of the Cases to cases under chapter 7 of the Bankruptcy Code; (e) appointment in the Cases of a chapter 11 trustee or an examiner with expanded powers or any other representative with expanded powers relating to the operations of the Debtors' businesses; (f) the entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Agents with respect to the Prepetition Collateral; (g) the failure by the Debtors to adhere to the Budget, subject to the Permitted Variance; (h) the failure by the Debtors to observe or perform any of the material terms or material provisions contained herein; (i) the failure of the Debtors to file, within one business day of the Petition Date, a joint notice of removal of the state court action styled *Vladimir Lenskiy v. Matra Petroleum USA, Inc.*; Cause No. 2019-31055 pending in the 157th Judicial District Court of Harris County, Texas, seeking removal of such action to this Court, and continue to pursue the removal of such action to this Court; (j) except as set forth in the preceding subparagraph (i) and paragraph I of the Interim Order, a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the Prepetition Liens or |

| Summary of Material Terms | |
|---|---|
| | asserting any other cause of action against and/or with respect to the Prepetition Obligations, the Prepetition Collateral, or any of the Prepetition Agents or Prepetition Lenders, including any causes of action released pursuant to the Debtors' Stipulations (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party), *provided, however*, that the Debtors' cooperation with informal or formal discovery in connection with such matters that is not initiated by the Debtors shall not constitute a Termination Event; (k) the Debtors shall create, incur or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to the Interim Order; and (ii) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business having a value less than $50,000 in the aggregate at any one time; (l) failure of the Debtors to file, within five (5) business days of the Petition Date, a motion and order seeking approval of bidding procedures (the "**Bid Procedures**") in connection with the sale of substantially all assets of the Debtors, unless otherwise agreed in writing by the Prepetition Secured parties; (m) a hearing on the Bid Procedures has not occurred within thirty (30) days of the Petition Date, unless otherwise agreed in writing by the Debtors and the Prepetition Secured Parties; and (n) other than the Carve-Out and DIP Claims (if any) the Debtors shall create, incur or suffer any other claim which is *pari passu* with or senior to the Adequate Protection Claims.<br><br>Following the occurrence of a Termination Event, and upon providing five (5) business days' advance written notice to the Debtors (the "**Termination Notice**") filed on the Court's docket, with a copy to counsel to the Debtors, counsel to any Committee and the U.S. Trustee (such five (5) business day notice period, the "**Remedies Notice Period**"), the Prepetition Secured Parties may exercise all rights and remedies under the Prepetition Loan Documents, the Interim Order and applicable law against the Debtors and the Prepetition Collateral without further order or application or motion to the Court.  During the Remedies Notice Period, the only issue that may be raised by the Debtors in opposition to the exercise of such rights and remedies shall be whether a Termination Event has in fact occurred and is continuing and the quantum of collateral diminution claims held by the Prepetition Secured Parties.  Upon the occurrence of a Termination Event and the |

| Summary of Material Terms | |
|---|---|
| | expiration of the Remedies Notice Period, (a) the Debtors no longer shall have the right to use or seek to use the Prepetition Collateral, including Cash Collateral (subject to the Carve-Out), (b) absent an order from this Court to contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code, as to all of the Prepetition Secured Parties, automatically shall be terminated without further notice to, or order of, the Court, and (c) the Prepetition Secured Parties shall be permitted to exercise all rights under the Prepetition Loan Documents, the Interim Order or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral in order to collect any amounts payable to the Prepetition Secured Parties and apply the same to such obligations without further order or application or motion to the Court and without restriction or restraint by any stay under section 105 or 362 of the Bankruptcy Code. Notwithstanding anything in the Interim Order to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code automatically shall be terminated for the purposes of giving any notice contemplated hereunder.  Any delay or failure of a Prepetition Secured Party to exercise rights under any Prepetition Loan Document or the Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.  Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Prepetition Secured Parties under the Interim Order shall survive the Termination Date. |
| **Carve Out** | The Prepetition Liens, and superpriority administrative expense claims granted hereunder and the pre-petition liens, security interests and mortgages held by any party, including without limitation, the Prepetition Agents and the Prepetition Lenders, shall be subject to and subordinate to (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court; (b) any expenses incurred by any chapter 7 trustee, such expenses not to exceed $25,000, in the aggregate; (c) all paid and unpaid claims for fees, costs, disbursements and expenses by persons or firms retained by the Debtors or any Committee (the "**Estate Professionals**") solely to the extent allowed pursuant to an order of the Court under sections 327, 328 or 363 of the Bankruptcy Code incurred prior to the filing of a Termination Notice; (d) all claims for fees, costs, disbursements and expenses of Estate Professionals incurred after the filing of the Termination Notice in an aggregate amount not to exceed $125,000, |

| Summary of Material Terms | |
|---|---|
| | solely to the extent allowed pursuant to an order of the Court under sections 327, 328 or 363 of the Bankruptcy Code ((a) through (d), collectively, the "**Carve-Out**").  The Prepetition Agents, each on behalf of itself and the relevant secured parties, shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out.<br><br>The Carve-Out shall be free and clear of all liens, claims and encumbrances granted hereunder and shall be subject only to the allowed claims of the professionals for such fees and expenses as may be awarded by the Court under sections 327, 328 or 363 of the Bankruptcy Code; provided, however, that, other than with respect to fees and expenses of the Debtors' counsel in connection with the Prepetition Litigation, the Cash Collateral and the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the Debtors or any other party-in-interest incurred in connection with the investigation or assertion of, or joinder in, any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter, when the purpose of such assertion of, or joinder in, any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter is to seek any order, judgment, determination, or similar relief: (a) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Prepetition Secured Obligations, the Prepetition Liens, or any other lien, security interest, right, or claim of any kind of the Prepetition Agents, Prepetition Lenders or their affiliate(s); or (b) preventing, hindering, or delaying, whether directly or indirectly, the assertion by the Prepetition Secured Parties or enforcement of their liens or realization upon any of the Prepetition Collateral; or (c) challenging the Prepetition Secured Obligations or the Prepetition Liens; or (d) seeking an affirmative recovery from the Prepetition Agents, Prepetition Lenders or any affiliate thereof, or (e) any act that has the effect of materially or adversely modifying or compromising the rights and remedies of the Prepetition Agents, Prepetition Lenders or an affiliate thereof; provided further that a Committee may incur up to $25,000 in the aggregate from the Cash Collateral (including the Carve-Out) in investigating the Prepetition Loan Agreements, Prepetition Secured Obligations, Prepetition Liens or claims against the Prepetition Secured Parties. |

| Summary of Material Terms | |
|---|---|
| **Effect of Stipulations on Third Parties.** | The Debtors' admissions and releases contained in paragraphs E, F, G and H (but subject to the exception set forth in paragraph I) of the Interim Order:  (a) shall be binding upon the Debtors for all purposes; and (b) shall be binding upon all other parties in interest, including any Committee, for all purposes unless a party in interest (subject in all respects to any agreement or applicable law which may limit or affect such entities right or ability to do so) (i)  has properly filed an adversary proceeding or contested matter by no later than the date that is seventy-five (75) days from the date of entry of the Interim Order (or, in the case of a Committee, sixty (60) days from the appointment of the Committee if such date is later), (A) challenging the amount, validity, enforceability, priority or extent of any of the Prepetition Secured Obligations or the Prepetition Secured Parties' respective security interests in and liens upon the Prepetition Collateral, or (B) otherwise asserting any claims or causes of action against the Prepetition Agents or Prepetition Lenders, in their capacity as such (including, without limitation, claims in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Secured Obligations, including causes of action under chapter 5 of the Bankruptcy Code); and (ii) obtains a final, non-appealable order in favor of such party in interest sustaining such claim brought in any such timely and properly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is properly filed as of such dates or the Court does not rule in favor of the plaintiff in any such proceeding, then:  (a) the Debtors' admissions and releases contained in paragraphs E, F, G and H (subject to paragraph I) of the Interim Order shall be binding on all parties in interest, including any Committee; (b) the obligations of the Debtors under the Prepetition Loan Documents shall constitute allowed claims for all purposes in the Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, perfected, first priority security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and (d) the Prepetition Secured Obligations and the Prepetition Secured Parties' security interests in and liens on the Prepetition Collateral shall not be subject to any other or further challenge by any Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto.  If any |

| Summary of Material Terms | |
|---|---|
| | such adversary proceeding or contested matter is properly filed as of such dates set forth in the Interim Order, the Debtors' admissions and releases contained in paragraphs E, F, G and H (subject to paragraph I of the Interim Order shall nonetheless remain binding and preclusive except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter. Nothing contained in the Interim Order shall be deemed to grant standing to a Committee or any other party to commence any such adversary proceeding or contested matter. |
| No Marshaling | Neither the Prepetition Agents nor the Prepetition Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral. |
| Postpetition Lien Perfection | Without the necessity of the filing of financing statements, security agreements, federal or state notices, pledge agreements, recordings, mortgages or other documents or taking possession or control of any Collateral, the Interim Order shall be sufficient evidence of the Prepetition Secured Parties' perfected security interests and liens granted in the Collateral pursuant to the Interim Order. Notwithstanding the foregoing, the Debtors are authorized and directed to execute such documents including, without limitation, mortgages, pledges and Uniform Commercial Code financing statements and to use Cash Collateral to pay such costs and expenses as may be reasonably requested by the Prepetition Agents to provide further evidence of the perfection of the Prepetition Secured Parties' security interests and liens in the Collateral as provided for herein. All such documents shall be deemed to have been recorded and filed as of the Petition Date. |
| Limitation on Charging Expenses Against Collateral | Subject to entry of the Final Order, all rights to surcharge any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Cases. |
| Reservation of Rights of the Prepetition Secured Parties | This Interim Order and the transactions contemplated hereby shall be without prejudice to (a) the rights of the Prepetition Secured Parties to seek additional or different adequate protection, move to vacate the automatic stay, move for the appointment of a trustee or examiner, move to dismiss or convert the Cases, or to take any other action in the Cases and to appear and be heard in any matter raised in the Cases, and |

| Summary of Material Terms | |
|---|---|
| | (b) any and all rights, remedies, claims and causes of action which the Prepetition Secured Parties may have against any non-Debtor party with respect to the Prepetition Secured Obligations. For all adequate protection and stay relief purposes throughout the Cases, the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date. For the avoidance of doubt, such request will survive termination of the Interim Order. |
| **Binding Effect Upon Successors and Assigns** | The provisions of the Interim Order shall be binding upon and inure to the benefit of the Prepetition Secured Parties, the Debtors, and their respective successors and assigns or any estate representative, including any trustee appointed in chapter 11 or chapter 7. |
| **Enforceability; Waiver of Any Applicable Stay** | This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, the Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of the Interim Order. |

### RELEVANT BACKGROUND

7.     The Debtors are Houston based independent oil and gas companies focusing on oil and gas production and development of oil & gas leases all located in Texas. As is well known, operating and market conditions in the oil and gas industry have undergone a profound transformation in recent years leading many companies to seek chapter 11 relief. The Debtors were able to navigate successfully through the last several years of industry distress through a combination of secured lender forbearances and additional borrowing, optimization of operations, and reduction of expenses

8.     As of July 1, 2019, the Debtors had combined secured debt in excess of $70 million, secured by liens on substantially all of the Debtors' assets, cash and equity. In April 2019, Matra's secured lenders worked with Matra to restructure the companies to cure loan defaults, increase the

business efficiency and to ensure its long-term viability, including a thirty-day forbearance agreement between the two secured lenders and the various Matra entities.  This restructuring effort was expected to allow the Debtors to continue operations and provide the ability to service the secured debt.  These restructuring efforts were frustrated by a Temporary Restraining Order (the "**TRO**") obtained on May 3, 2019 by a former executive of Matra USA who obtained a $2.4 million judgment against Matra USA.  The TRO prevented all of the Debtors from accomplishing any kind of restructuring or transfers of assets and impacted its ability to continue operations.

9.      In short, the Debtors explored nearly every measure to avoid filing these chapter 11 cases.  But, with a TRO and then a subsequent Temporary Injunction (the "**TI**") in place and continued litigation expenses for the foreseeable future, the Debtors had few options.  Having learned about the Debtors' legal challenges, nearly all service providers demanded immediate payments on accounts payables and refused to provide services without immediate pay.  Further, in July 2019, the Debtors' senior secured lender foreclosed on a substantial number of the Debtors' oil and gas leases that produce about 95% of Debtors cash flow which resulted in the loss of most of the Debtor's operations.  In the face of declining liquidity, Debtors elected to initiate these Chapter 11 cases in order to conduct an orderly liquidation of its remaining assets and maximize value for the benefit of creditors.

A.      **Summary of Prepetition Secured Loans**

1.      *Matra USA Secured Indebtedness*

10.     On July 17, 2015, Matra USA entered into a Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Matra USA Loan Agreement**"), with Melody, as Administrative Agent for the lenders for a loan in the original principal amount of $20 million ("**Matra USA Loan**").

11.     In connection with the Matra USA Loan Agreement, Matra USA and Melody entered into a Guaranty and Collateral Agreement (the "**Matra USA Security Agreement**"), pursuant to which Matra USA granted to Melody a first priority lien on substantially all of Matra USA's assets.  Pursuant to the Matra USA Security Agreement, Matra USA and Matra Operating granted to Melody a lien on substantially all of its property, including, among other things, on all (i) accounts; (ii) deposit accounts (other than payroll, withholding tax and other fiduciary deposit accounts); and (iii) proceeds from its property (which would include cash generated from the sale or disposition of Matra USA's property).

12.     Further, in connection with the Matra USA Security Agreement, Melody filed: (i) a deed of trust, mortgage, fixture filing, assignment of as-extracted collateral, security agreement and financing statement in the real property records in each county in which Matra USA owns real property; (ii) a UCC Financing Statement with the Delaware Department of State covering all assets of Matra USA (the "**UCC-1**") and (iii) a UCC Financing Statement with the Texas Secretary of State covering all assets of Matra Operating. Matra USA and Melody also entered into two deposit account control agreements securing Melody's interest in Matra USA's deposit accounts (the "**DACAs**").  The Matra USA Security Agreement, UCC-1 and the DACAs act together to grant and perfect Melody's security interest in Matra USA's cash.

13.     Pursuant to the Fourth Amendment and Waiver to Loan Agreement dated as of March 30, 2018, between Matra USA and Melody (the "**Fourth Amendment**"), the parties agreed to (i) increase Matra USA's indebtedness under the Matra USA Loan Agreement by $10 million of which approximately $8 million was actually advanced to finance a company drilling program intended to increase production levels and, ultimately, revenue, (ii) release Matra Operating from its obligations under the Matra USA Security Agreement, and (iii) grant Melody a first priority

continuing security interest in, lien on, and right of set off against 667 shares of stock of Matra USA owned by Matra AB.  In connection with the Fourth Amendment, Melody filed a UCC Financing Statement with the Washington DC Recorder of Deeds covering the 667 shares of stock of Matra USA owned by Mara AB and any proceeds derived thereof.

14.     As of August 1, 2019, the outstanding balance under the Matra USA Loan, including unpaid, accrued interest, is approximately $47.83 million.

### 2.     *Matra Terra Secured Indebtedness*

15.     On January 28, 2016, CoreTerra Corporation ("**CoreTerra**"), an affiliate of Melody, entered into a Loan Agreement with Melody, as Administrative Agent, and the lenders thereto (the "**CoreTerra Loan Agreement**") with an aggregate principal amount of $4 million. In connection with the Core Terra Loan Agreement, CoreTerra and Melody executed and recorded a deed of trust encumbering substantially all of CoreTerra's assets (the "**CoreTerra Deed of Trust**").

16.     On June 4, 2018, CoreTerra transferred substantially all of its assets to Matra Terra, including all of the assets securing the CoreTerra's obligations under the CoreTerra Loan Agreement.  In connection with the purchase, (i) Matra Terra assumed CoreTerra's obligations under the CoreTerra Loan Agreement, (ii) CoreTerra and CoreTerra Operating, LLC entered into an Assignment and Assumption Agreement dated June 4, 2018, and (iii) the CoreTerra Deed of Trust in favor of Melody was amended to reflect Matra Terra's assumption of the CoreTerra obligations.

17.     On June 4, 2018, the CoreTerra Loan Agreement was replaced in its entirety with that certain Amended and Restated Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Matra Terra Loan Agreement**")

among Matra Terra, as borrower, Melody as Administrative Agent and the Lenders a party thereto with an aggregate principal amount of $4 million ("**Matra Terra Loan**").

18.     In connection with the Matra Terra Loan Agreement, Matra Terra, Matra USA and Melody entered into that certain Amended and Restated Pledge and Security Agreement (the "**Matra Terra Security Agreement**"), pursuant to which (i) Matra Terra granted to Melody a security interest in substantially all of Matra Terra's assets and (ii) Matra USA pledged to Melody all of its equity interests in Matra Terra.  Matra Terra also executed an Assumption Agreement (the "**Assumption Agreement**"), in favor of Melody, pursuant to which Matra Terra became a party to the Matra USA Security Agreement and granted to Melody a first priority lien on substantially all of its assets.

19.     In connection with the Matra Terra Security Agreement and the Assumption Agreement, Melody filed: (i) an Amended and Restated Deed of Trust, Mortgage, Fixture Filing, Assignment of As-Extracted Collateral, Security Agreement and Financing Statement in the real property records in each county in which Matra Terra owns real property and (ii) a UCC financing statement covering 100% of Matra USA's equity interests in Matra Terra and all proceeds thereof.

20.     As of August 1, 2019, the aggregate outstanding principal of the Matra Terra Loan was $4,340,078, including interest.

21.     As of August 1, 2019, the aggregate outstanding principal of the Matra USA Loan and the Matra Terra Loan was in excess of $51 million and both loans were in default.

### 3.     *Matra O&G Loans*

22.     On February 23, 2017, Matra O&G, as successor in interest to FirstBorger Oil & Gas, Inc., entered into an Amended and Restated Credit Agreement, Revolving Credit Note and Term Note and related loan documents (as amended, restated, supplemented or otherwise modified

from time to time, collectively the "Matra O&G Loan Agreement") with LegacyTexas, as Administrative Agent and L/C Issuer, whereby the 2014 loan agreement by and amongst FirstBorger Oil & Gas, Inc. and Green Bank was amended and restated to provide, in pertinent part, for Matra O&G as borrower to a revolving line of credit in the amount of $50 million and a term note in the amount of $5 million (collectively, the "Matra O&G Loans"). The Matra O&G Loans are secured by liens on substantially all assets owned by Matra O&G.

23.     On February 6, 2019, Matra O&G received a letter from LegacyTexas Bank setting forth an additional event of default that was triggered due to Matra USA's failure to achieve the production benchmark required under the Matra USA Loan Agreement.

24.     On June 6, 2019, under the provisions of the Matra O&G Loan Agreement, the Matra O&G Loans were acquired by Bjorger Oil & Gas LLC ("Bjorger O&G"), an affiliate of Melody, as Administrative Agent and L/C Issuer. At the time, the outstanding balance of the Matra O&G Loans was approximately $25 million.

25.     Also, on June 6, 2019, Matra O&G received a Notice of Acceleration setting forth certain events of default under the Matra O&G Loan Agreement and a Notice of Foreclosure Sale on the collateral securing the Matra O&G Loans.   A foreclosure of the assets was conducted on July 2, 2019. These assets represent approximately 95% of the assets owned by Matra O&G.

26.     Subsequent to foreclosure, Bjorger O&G requested that Matra O&G execute documents required to transfer operatorship of the foreclosed oil and gas leases. Due to the uncertainty of the breadth of the TI as described below, Matra O&G refused this request for fear of violating the order.

**B.**     **Need for Immediate Use of Cash Collateral**

27.     The Debtors in consultation with their proposed restructuring officer, Drew McManigle of MACCO Restructuring Group, reviewed and analyzed the Debtors' projected cash needs and prepared a thirty (30) day budget (the "Interim Budget") (which may be updated from time to time in accordance with the terms of the Interim Order) outlining the Debtors' postpetition cash needs.  A copy of the Interim Budget is attached as Exhibit A.  The Debtors believe that the Interim Budget, which contains line items for cash flows anticipated to be received and disbursed, is an accurate reflection of their operating requirements over the identified period and the anticipated administrative expenses of the chapter 11 cases.  The Debtors believe that the Interim Budget is reasonable and appropriate under the circumstances and includes all reasonable, necessary, and foreseeable expenses to be incurred during the period set forth in the Interim Budget.  Based on this forecast the Debtors' determined that they would require access to Cash Collateral to provide sufficient liquidity to administer the Debtors' estates during these chapter 11 cases.

28.     As reflected in the Interim Budget, as of the Petition Date, the Debtors will have approximately $380,000 in cash on hand, all of which is encumbered by Melody's security interests.  The Debtors need access to cash collateral to make necessary payments essential to continued operation and the preservation of the Debtors' assets.

29.     Using Cash Collateral to fund the continued operation of the Debtors' businesses will facilitate the preservation of the Prepetition Collateral while maximizing the value of the Debtors' estates to the benefit of all creditors.  Melody has agreed to the use of Cash Collateral set forth in the Interim Budget without the need for adequate assurance payments.  Melody has

reserved rights to request adequate assurance payments in any final cash collateral order that may be entered.

30.     Without the immediate relief requested by this motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm.  Access to Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases.

**C.     Debtor-In-Possession Financing**

31.     The Debtors also request, in connection with  entry of a final order authorizing cash collateral, authority to enter into DIP Financing (the "**DIP Facility**") with Bjorger Petroleum Corp. (the "**DIP Lender**").[2]  Debtors anticipate that cash flow from operations may be insufficient to fund operations through the conclusion of this case.  The DIP Facility will be used to help fund expenses in the Debtors' chapter 11 cases.

32.     Generally, the DIP Facility will give the Debtors access to cash of up to $500,000.00 in delayed-draw term loans (the "**DIP Loans**") and include a roll-up of $500,000 in Prepetition Obligations under the U.S.A. Loan Agreement (the "**Roll-Up Loan**").  The DIP Obligations will be guaranteed jointly and severally among the Debtors and would allow DIP Lender a fully perfected, super priority security interest in all tangible and intangible assets and property of the Companies or their estates (the "**DIP Liens**") subject to the Carve-Out.  Presently, the DIP Lender has also requested a lien on all avoidance actions of the Debtors' respective estates. The DIP Facility would bear interest at a rate of 7%, paid in kind on a monthly basis, and require the Debtors to pay $50,000 for all reasonable costs and expenses of the DIP Agent and the DIP

---

[2] The Debtors and the DIP Lender have not reached an agreement on all term of the DIP Facility.  A supplement setting out all material terms to the DIP Facility will be filed no later than ten (10) days before a final hearing on this Motion.

Lenders incurred in the preparation of the DIP Facility, including attorneys' fees.  The Debtors would also be required to pay reasonable fees and out-of-pocket expenses incurred by the DIP Agent and DIP Lender as well as an exit fee equal to 5% of the outstanding balance (which would not be payable if the DIP Loans are credit bid in sale under section 363 of the Bankruptcy Code).

## BASIS FOR RELIEF

**A.     The Debtors Should Be Authorized to Use the Cash Collateral.**

33.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[3] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

34.     Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, Melody consents to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  Therefore, the Debtors respectfully submit that they have satisfied the standards of section 363(c)(2) of the Bankruptcy Code.

---

[3] Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

35.     As described herein, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry into the chapter 11 cases. The Debtors believe use of Cash Collateral is in the best interests of the Debtors' estates and creditors and that the use of Cash Collateral on an interim and final basis should be approved.

**B.      The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate.**

36.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case by case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).  Courts generally have found that using cash collateral to preserve the value of the secured creditors' collateral is a form of adequate protection in itself. *See, e.g., In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that

debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

37.     As described more fully above, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Lenders with a variety of safeguards to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay: replacement liens and superpriority claims under section 507(b) of the Bankruptcy Code and continued access to information and financial reporting.  Notably, the Prepetition Secured Lenders are not receiving payment in cash of any postpetition interest or payment of any professional fees and expenses (other than in their capacity as DIP lenders if the DIP Facility is subsequently approved in connection with the Final Order).

38.     The Debtors submit that these proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Lenders from diminution in value to the Cash Collateral.  Moreover, courts in this district have approved similar adequate protection packages in other recent chapter 11 cases. *See, e.g., In re iHeartMedia, Inc.*, No 18-31274 (MI) (Bankr. S.D. Tex. Apr. 12, 2018) (approving adequate protection in the form of, among other things, replacement liens on prepetition collateral, superpriority administrative claims pursuant to section 507(b), and fees and expenses); *In re Cobalt Int'l Energy, Inc.*, No. 17-336709 (MI) (Bankr. S.D. Tex. Jan. 25, 2018) (same); *In re Seadrill Limited*, No. 17-60079 (DRJ) (Bankr. S.D. Tex. Oct. 24, 2017) (same); *In re Goodman Networks, Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. Apr. 20, 2017) (same); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 29, 2016) (same).

39.     In light of the foregoing, the Debtors further submit—and the Prepetition Secured Lenders agree—that the proposed adequate protection obligations to be provided for the benefit of the Prepetition Secured Lenders are fair, reasonable, and appropriate.[4] Thus, the Debtors' provision of the adequate protection obligations is not only necessary to protect against diminution in value, as required by sections 363(c)(2) and 363(e) of the Bankruptcy Code, but is fair and appropriate under the circumstances of the chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**C.     The Scope of the Carve Out is Appropriate.**

40.     The proposed adequate protection is subject to the Carve Out contained in the Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors and a statutory committee.

41.     Courts in this district have approved similar carve out provisions in other recent chapter 11 cases.  *See, e.g., In re iHeartMedia, Inc.*, No 18-31274 (MI) (Bankr. S.D. Tex. Apr. 12,

---

[4] Pursuant to the Orders, the Prepetition Secured Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

2018) (approving a carve out provision similar to the Carve Out); *In re Cobalt Int'l Energy, Inc.*, No. 17-336709 (MI) (Bankr. S.D. Tex. Jan. 25, 2018) (same); *In re Seadrill Limited*, No. 17-60079 (DRJ) (Bankr. S.D. Tex. Oct. 24, 2017) (same); *In re Goodman Networks, Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. Apr. 20, 2017) (same); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. July 5, 2016) (same).

**D.    Interim Relief Should be Granted.**

42.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "**Complex Case Procedures**") provide that "on motion by the debtors, a hearing will routinely be conducted within three business days to consider . . . cash collateral use." Complex Case Procedures, ¶ 18.

43.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors to use Cash Collateral as needed on the terms provided in the proposed Interim Order.  The Debtors require such access prior to the Final Hearing and entry of the Final Order for the various reasons discussed above, including to ensure they have the necessary liquidity to continue operating, to pay their administrative expenses, and to implement

the relief requested in the Debtors' other "first day" motions. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

44.     In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to support immediate access to Cash Collateral pending the entry of the Final Order, and respectfully request that the Court grant the relief requested herein and authorize the immediate use of the Cash Collateral pursuant to the terms and conditions set forth in the Interim Order.

**E.     The DIP Facility Should Be Approved at the Final Hearing**

45.     The Debtors will require access to the DIP Facility in addition to continued use of cash collateral. The Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 estates on a cash collateral basis, rendering postpetition financing a necessity. As such, after consideration of the DIP Facility at the Final Hearing, the Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.

46.     Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized

on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

47.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

48.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

49.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment following a thorough process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require postpetition financing to support the administration of their chapter 11 cases.  The Debtors believe that the DIP Facility offers the best available alternative as they afforded the Debtors the greatest flexibility, with the fewest restrictions, and at the lowest cost.  Accordingly, the Court

should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

## REQUEST FOR FINAL HEARING

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and not later than August 30, 2019 and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## EMERGENCY CONSIDERATION

51.     Pursuant to Bankruptcy Local Rule 9013-1(i) and Bankruptcy Rule 6003, the Debtors request that the Court consider the Motion on an emergency basis "to avoid immediate and irreparable harm."  As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in the authorization to use Cash Collateral could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

52.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

WHEREFORE, the Debtors respectfully request that the Court enter the interim order, substantially in the form attached hereto granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

DATED:          July 31, 2019

                                         Respectfully submitted,

                                         HOOVER SLOVACEK LLP

                                         By: */s/ Melissa A. Haselden*
                                         MELISSA A. HASELDEN
                                         State Bar No. 00794778
                                         5051 Westheimer, Suite 1200
                                         Houston, Texas 77056
                                         Telephone: 713.977.8686
                                         Facsimile:  713.977.5395
                                         haselden@hooverslovacek.com

**OF COUNSEL:**
HOOVER SLOVACEK LLP
Deirdre Carey Brown
State Bar No. 24049116
brown@hooverslovacek.com
Vianey Garza
State Bar No. 24083057
garza@hooverslovacek.com
5051 Westheimer, Suite 1200
Houston, Texas 77056
Telephone: 713.977.8686
Facsimile:  713.977.5395

*Proposed Attorneys for Debtors and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 1, 2019 a copy of the *Emergency Motion of Debtors and Debtors In Possession For Interim and Final Orders Authorizing Debtors to (A) Use Cash Collateral and Other Collateral and Grant Adequate Protection to Prepetition Secured Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364; (B) Upon Entry of A Final Order, Enter Into A Debtor-In-Possession Financing Facility; (C) Schedule Final Hearing Pursuant to Rules 4001(B), 4001(C) and 9014; and (D) Grant Related Relief* was served in the United States Trustee, the 20 largest unsecured creditors of the Debtors, certain governmental entities, counsel and parties-in-interest by first class mail.

*/s/ Melissa A. Haselden*
MELISSA A. HASELDEN