**EXHIBIT 2**

1                      CAUSE NO. 2019-31055

2 VLADIMIR LENSKIY,              )   IN THE DISTRICT COURT OF
        Plaintiff,               )
3
   VS.                           )   HARRIS COUNTY, T E X A S
4
   MATRA PETROLEUM USA, INC.;    )
5 MATRA PETROLEUM OIL & GAS      )
   LLC; MATRA PETROLEUM          )
6 OPERATING LLC; MATRA TERRA     )
   LLC; MELODY CAPITAL           )
7 MANAGEMENT, LLC; MAXIM         )
   BARSKIY                       )
8      Defendants.               )   157TH  JUDICIAL DISTRICT

9

10

11

12          *******************************************

       ORAL AND VIDEOTAPED DEPOSITION OF
13
                   SERGEY FUNYGIN
14
                   MAY 15, 2019
15
            *******************************************
16

17

18

19 ORAL AND VIDEOTAPED DEPOSITION of SERGEY FUNYGIN,
   produced as a witness at the instance of the Plaintiff,
20 and duly sworn, was taken in the above-styled and
   numbered cause on the 15th of May, 2019, from 1:34 p.m.
21 to 2:59 p.m., before Wendi Broberg, CSR in and for the
   State of Texas, reported by machine shorthand, at the
22 Law Offices of Porter & Hedges, L.L.P., 1000 Main
   Street, 36th Floor, Houston, Texas 77002, pursuant to
23 the Texas Rules of Civil Procedure.

24

25

2

```
1                A P P E A R A N C E S

2

  FOR THE PLAINTIFF VLADIMIR LENSKIY:
3

4     MR. LOGAN E. JOHNSON
      SCHIFFER HICKS JOHNSON, P.L.L.C.
5     700 Louisiana
      Suite 2650
6     Houston, Texas  77002
      Ph. (713) 357-5150
7     Fax (713) 357-5160
      E-mail:  ljohnson@shjlawfirm.com
8

9
  FOR THE DEFENDANTS MATRA PETROLEUM USA, INC.; MATRA
10 PETROLEUM OIL & GAS LLC; MATRA PETROLEUM OPERATING LLC;
  MATRA TERRA LLC:
11

12    MS. HEATHER K. HATFIELD
      MR. R. BLAKE RUNIONS - (VIA TELEPHONE)
13    PORTER & HEDGES, L.L.P.
      1000 Main Street
14    36th Floor
      Houston, Texas 77002
15    Ph. (713) 226-6622
      Fax (713) 226-6222
16    E-mail:  hhatfield@porterhedges.com

17

18 FOR THE DEFENDANT MELODY CAPITAL MANAGEMENT, LLC:

19
      MS. ELIZABETH F. KLINGENSMITH
20    MR. ROBERT SCOTT
      BLANK ROME, L.L.P.
21    717 Texas Avenue
      Suite 1400
22    Houston, Texas  77002
      Ph. (713) 228-6601
23    Fax (713) 228-6605
      E-mail:  lklingensmith@blankrome.com
24

25
```

3

```
 1          A P P E A R A N C E S (Continued)

 2
    ALSO PRESENT:
 3
        Mr. Vladimir Lenskiy
 4      Mr. Patrick Braun - Videographer

 5

 6  REPORTED BY:

 7      WENDI BROBERG, CSR 7091
        Contracted by:
 8      Discovery Resource
        1511 West 34th Street
 9      Houston, Texas  77018
        Ph. (713) 223-3300
10      Fax (713) 228-3311

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1                         INDEX

2  Appearances ...................................2

3  Index .........................................4

4  Index of Exhibits .............................4

5  SERGEY FUNYGIN

6      Examination by Mr. Johnson ...............5

7  Signature of Witness .........................71

8  Reporter's Certification .....................72

9

10                   INDEX OF EXHIBITS

11  NUMBER          DESCRIPTION          MARKED/IDENTIFIED

12  7        Matra Petroleum USA & Matra        22
            Petroleum AB Proposed
13          Restructuring Terms dated March
            2019
14
    8        Forbearance Agreement (Bates Nos.  45
15          MATRADEF001862 through
            MATRADEF001891)
16
    9        E-mail from Sergey Funygin to      52
17          Maxim Barskiy dated March 7, 2019
            (Bates No. MATRADEF003955)
18
    10       E-mail from Sergey Funygin to      56
19          Blake Yaralian dated April 9,
            2019 (Bates Nos. MATRADEF004233
20          and MATRADEF004234)

21  11       E-mail from Sergey Funygin to      62
            Blake Yaralian dated April 10,
22          2019 (Bates Nos. MATRADEF000970
            and MATRADEF000971)
23

24

25
```

5

1          **THE VIDEOGRAPHER:**  We are on the record.

2 Today's date is May 15th, 2019.  The time is 1:34 p.m.

3 Please wait for the court reporter to swear in the

4 witness.

5                    (Witness sworn)

6          **THE WITNESS:**  I do.

7               SERGEY FUNYGIN,

8 having been first duly sworn, testified as follows:

9                  EXAMINATION

10 **BY MR. JOHNSON:**

11   Q    Would you please state your full name for the

12 record.

13     **A    Sergey Funygin.**

14   Q    All right, Mr. Funygin.  And where do you

15 currently reside?

16     **A    Houston, Texas.**

17   Q    What's the address there?

18     **A    5005 Hidalgo, H-i-d-l-g-o, Street, Unit 301.**

19   Q    Have you ever had your deposition taken before?

20     **A    Yes.**

21   Q    How many times?

22     **A    Once.**

23   Q    When was that?

24     **A    In 2015.**

25   Q    And tell me about that deposition.  What --

6

1 what type of legal proceeding was it in?

2     **A**    **It was a legal action brought against Matra**

3 **Petroleum Operating by -- by one of our landlords.**

4     Q    By one of your landlords?

5     **A**    **Yes.**

6     Q    Which landlord?

7     **A**   **Chris Bright & Cattle.**

8     Q    And what was the nature of the dispute?

9     **A**   **Excessive use of land.**

10     Q    Other than that deposition, have you ever

11 provided any other testimony, be it in a deposition or

12 court of law?

13     **A**    **No.**

14     Q   All right.  Given that it's been a little

15 while, I'll just go over a couple of ground rules with

16 you.  I know you were in here for Ms. Selezneva's

17 deposition, but as an initial matter I'd like to get an

18 agreement that you'll endeavor to let me finish my

19 question and then I'll try to give you the same courtesy

20 when you're answering my question; fair?

21     **A**   **Sure.**

22     Q   All right.  You understand that the oath you

23 just took is to tell the truth, correct?

24     **A**   **Yes, sir.**

25     Q   All right.  I'm going to ask that if you don't

1 understand one of my questions, you ask me to rephrase

2 it, and I will attempt to put it in a form you do

3 understand.  Okay?

4      **A     Yes.**

5      Q    All right.  If you don't ask for clarification

6 and you answer my question, the record's going to

7 reflect that you understood the question and you

8 answered it truthfully; fair?

9      **A     Yes.**

10     Q    All right.  How long have you worked at Matra?

11     **A     Since end of 2013 I've been working as Chief**

12 **Operating Officer of Matra Petroleum Operating, and in**

13 **November of last year when Maxim Barskiy resigned, I was**

14 **appointed as CEO of Matra Petroleum USA.  All this time**

15 **I have been on payroll of Matra Petroleum Operating.**

16     Q    Okay.  So whether you're -- you've been in a

17 role for Matra Operating or Matra -- what I'll refer to

18 as Matra USA, you'll know what I'm referring to --

19     **A     Yes.**

20     Q    -- you've been paid by Matra Operating?

21     **A     Yes, sir.**

22     Q    Okay.  Have you ever not been paid?  Have

23 you --

24     **A     No.**

25     Q    Huh?

1    **A    No.**

2    Q    Okay.  You've always been paid for your work --

3    **A    Yes.**

4    Q    -- at Matra?

5              All right.  You understand that your

6  testimony today is as though you're in a court of law,

7  correct?

8    **A    Yes, sir.**

9    Q    And you understand that you're subject to the

10 penalties of perjury --

11   **A    Yes.**

12   Q    -- should you not tell the truth; fair?

13   **A    Yes.**

14   Q    All right.  You produced -- and we'll go -- I

15 know you saw some of them in Ms. Selezneva's deposition.

16 Some e-mails of yours were produced in this litigation.

17 Do you understand that?

18   **A    Yes.**

19   Q    Okay.  And have you had a chance to review some

20 of those e-mails.

21           **MS. HATFIELD:**  So I want you to answer the

22 question to the extent that you reviewed e-mails and

23 they refreshed your recollection.  The rest -- what I

24 showed you is my work product.

25   **A    Yes, yesterday I reviewed them.**

1    Q    (By Mr. Johnson)  Okay.  And your -- those are

2 your e-mails, right, the ones that are from -- from you

3 or to you, correct?

4    **A    From me, yes.**

5    Q    Okay.  And you kept those e-mails in the

6 regular course of business, correct?

7         **MS. HATFIELD:**  Objection.  Form.

8    **A    In my mailbox.**

9    Q    (By Mr. Johnson)  Sure, sure.  And the e-mails

10 if -- and we'll look at several.  The time stamp that's

11 on them indicates when you sent or received these

12 e-mails; fair?

13         **MS. HATFIELD:**  Objection.  Form.

14    Q    (By Mr. Johnson)  You can answer.

15    **A    Yes, Houston time.**

16    Q    Yes, Houston time.

17    **A    All the time I was here in Texas.**

18    Q    All right.  All right.  Okay.  You stated in

19 the beginning that your current role is at -- as CEO of

20 Matra USA?

21    **A    My second role.  My first position is Chief**

22 **Operating Officer of Matra Petroleum Operating.**

23    Q    Okay.

24    **A    And I spend 95 percent of my time running that**

25 **company and maybe only 5 percent of my time is being**

1 **allocated to Matra USA.**

2    Q    Okay.  You -- where do you office?

3    **A    We -- you know, in Borger, Texas, our operating**

4 **office is in Borger, Texas.  This is -- this is the**

5 **place where all our field employees who report to me are**

6 **located.**

7    Q    Okay.  So that's where you office?

8    **A    Yes, operating office.**

9    Q    Okay.  And that's where you perform your

10 functions as both C -- COO of Matra Operating and CEO of

11 Matra USA?

12    **A    No, it is the office of Matra Petroleum**

13 **Operating.**

14    Q    Okay.  Do you ever do job functions for Matra

15 USA in Borger?

16    **A    From time to time, you know, when I have**

17 **requests from the CEO of Matra A-- from Matra AB or**

18 **Elena as COO of Matra USA, you know, I see them with**

19 **some issues.**

20    Q    And vice versa, do you -- do you ever come to

21 the Houston office?

22    **A    Yes, I live, you know, my home here.  So I**

23 **spend about half of my time on the field and, of course,**

24 **I come home to take break and when I'm here, I work for**

25 **Matra USA office.**

Discovery Resource
713-223-3300

1    Q    Okay.  And when you work from Matra USA

2  offices, if I understand your testimony, you are

3  performing 95 percent of the time functions as COO of

4  Matra Operating?

5    **A    Yes, sir.**

6    Q    And then 5 percent of the time as CEO of Matra

7  USA?

8    **A    Yes, since November of last year.**

9    Q    Okay.  Is there any record anywhere within

10  Matra of how that time is allocated or broken down?

11         **MS. HATFIELD:**  Objection.  Form.

12    **A    As far as I know, no.**

13    Q    (By Mr. Johnson)  All right.  Yeah, because I

14  haven't seen any documents where it says, hey, I'm

15  sending this as the Matra Operating COO, right?  And I

16  haven't -- conversely, I haven't seen an e-mail where

17  you say I'm sending this as the Matra USA CEO, right?

18         **MS. HATFIELD:**  Objection.  Form.

19    **A    Yes, because, you know, at this position at**

20  **Matra USA used to be held by Maxim Barskiy, but, you**

21  **know, after he left and all the layoffs we've -- you**

22  **know, we've completed, there simply -- you know, we**

23  **don't -- we didn't have people to take, you know, this**

24  **vacant position.  So I was told, you know, to -- to wear**

25  **this helm as well.**

12

1    Q    (By Mr. Johnson)   Okay.   What was the reason

2 for Mr. Barskiy resigning?

3    **A    Now he works as CEO of Russian company.   As far**

4 **as I know, this is public information.   There have been**

5 **announcements all over.**

6    Q    Okay.   And that's fair.   I just want to know

7 what you know.

8    **A    Uh-huh.   Oh, I know that he's the --**

9    Q    Is that -- is that his stated reason for

10 resigning?

11          **MS. HATFIELD:**   Objection.   Form.

12    **A    I don't know.   Maybe.   You know, you need to**

13 **ask him.**

14    Q    (By Mr. Johnson)   Well, I've got you here

15 today.   I don't --

16    **A    But I don't know.   I cannot answer for him.**

17    Q    Okay.   Tell me how you learned about his

18 resignation.

19    **A    He called me sometime in October and he said**

20 **that I am going to work as CEO of Siberian Anthracite,**

21 **and that, you know, he's going to recommend the Board to**

22 **appoint me, you know, as his replacement.**

23    Q    And refresh my recollection as to when you were

24 appointed CEO of Matra USA.

25    **A    I don't remember the exact date, but it was**

13

1  **November of last year.**

2      Q      November of 2018?

3      **A      Yes.**

4      Q      And who appointed you?

5      **A      There was a Board Resolution.**

6      Q      And remind me of who's on the Board?

7      **A      At Matra AB level, there are four people --**

8  **Maxim Barskiy himself, then Ekaterina Konshina --**

9      Q      Uh-huh.

10      **A      -- Eric Forss and Frank -- Frank Lytle.**

11      Q      Okay.  And I think those are the same names

12  that Mrs. Selezneva gave us.  And that's the only board,

13  right, within the Matra group of entities?

14      **A      Speaking of Matra U -- Matra AB, yes, I'm not**

15  **aware of any other --**

16      Q      Yeah.

17      **A      -- boards.**

18      Q      There's -- you're not aware of an independent

19  board for Matra USA, correct?

20      **A      No.**

21      Q      And you're not aware of an independent board

22  for Matra Operating, correct?

23      **A      No.**

24      Q      And you're not aware of an independent board

25  for Matra Oil & Gas, correct?

14

1      **A      No.**

2      Q      And you're not aware of an independent board

3 for Matra Terra, correct?

4      **A      No.**

5      Q      Do you have an employment contract?

6      **A      Yes, sir.**

7      Q      What's the employment contract say?

8              **MS. HATFIELD:**  Objection.  Form.

9      Q      (By Mr. Johnson)  What -- what position -- to

10 the best of your recollection, what position is

11 designated in the employment contract?

12     **A      I have two employment contracts.  One of them**

13 **is with Matra Petroleum Operating as COO of Matra**

14 **Petroleum Operating, and my second agreement is with**

15 **Matra Petroleum USA as CEO of Matra Petroleum USA.**

16     Q      And other than yourself, who -- who's the other

17 signatory to those agreements on behalf of the Matra

18 entities?

19     **A      Maxim Barskiy.**

20     Q      In both instances, correct?

21     **A      Yes, sir.**

22     Q      Since you've become the CEO of Matra USA, have

23 you held any board meetings?

24     **A      I participated in at least two meetings, but it**

25 **was via the phone.**

1    Q    And when were they?

2    **A    The last one, it was in February, and if I**

3 **remember it right, the first one was either in January**

4 **or December, December of last year.**

5    Q    And, again, that's the same four folks that we

6 talked about earlier?

7    **A    Yes.**

8    Q    Okay.  And that's the Board of Matra AB,

9 correct?

10   **A    Yes, sir.**

11   Q    Did Melody provide a consent to you becoming

12 CEO of Matra USA?

13             **MS. KLINGENSMITH:**  Objection.  Form.

14   **A    As I'm aware of, no.**

15   Q    (By Mr. Johnson)  Are you aware of any consents

16 by Melody for Mr. Barskiy stepping down?

17             **MS. KLINGENSMITH:**  Objection.  Form.

18   **A    As I'm aware of, no.**

19   Q    (By Mr. Johnson)  Who do you direct -- excuse

20 me.

21             Who do you report to?

22   **A    I re --**

23             **MS. HATFIELD:**  Objection.  Form.  Go

24 ahead.  You can answer.

25   **A    I report to Maxim Barskiy.**

16

1    Q    (By Mr. Johnson)  Anyone else?

2    **A    That's it.**

3    Q    As the CEO of Matra USA, what interests are a

4 priority to you?

5         **MS. HATFIELD:**  Objection.  Form.

6    **A    First of all, you know, to preserve the value**

7 **of the company.  The second one to keep -- and to**

8 **preserve the value of the company mean -- it means that,**

9 **you know, I need to keep operations ongoing.**

10   Q    (By Mr. Johnson)  Okay.  What else?

11        **MS. HATFIELD:**  Objection.  Form.

12   Q    (By Mr. Johnson)  And this is as your role as

13 CEO of Matra USA?

14   **A    Yes.**

15   Q    All right.  So how are you keeping -- how are

16 you ensuring that the operations of Matra USA keep

17 going?

18   **A    First of all, let me clarify this.  You know,**

19 **the real operations are being conducted by Matra**

20 **Petroleum Operating.  This is a company that produces**

21 **oil and gas, sells oil and gas, employs people, pays**

22 **invoices, and this is a company that creates value for**

23 **its shareholders, stakeholders and -- and creditors and**

24 **lenders.  Matra USA, as you know, has no operations.**

25   Q    Does it have any capitalization?

17

1  **A**  **No.**

2  Q  Okay.  So all -- what you're telling me is all

3 the revenue for all the Matra entities is coming out of

4 Operating?

5     **MS. HATFIELD:**  Objection.  Form.

6  **A**  **Let me again, you know, to clarify this:**

7 **Matra -- Matra USA has had different sources of cash.**

8 **One source was money from the markets through Matra AB,**

9 **so Matra AB is a public company.  It's used to raise**

10 **money for Matra operations in the United States.  This**

11 **was the first source of cash.  The second source of cash**

12 **has been loans from Melody.**

13  Q  (By Mr. Johnson)  Okay.

14  **A**  **And from time to time, Matra AB and Matra USA,**

15 **they were taking some cash out of Matra Operating to pay**

16 **interest rates to lenders and to pay some G&A expenses.**

17  Q  Okay.  You mentioned that some of the revenue

18 from Matra USA came from Matra AB?

19  **A**  **Yes.**

20  Q  Okay.  And then that money would be used to

21 help fund the operations of Matra Operating, correct?

22  **A**  **This money were used to fund G&A of Matra AB**

23 **and Matra USA and also to fund capital expenses of Matra**

24 **Petroleum Operating.**

25  Q  Okay.  And for those -- for the ladies and

1 gentlemen of the jury that don't know, what is G&A?

2      **A      General and administrative expenses.**

3      Q      Okay.  And those general administrative

4 expenses are, again, down at the operational level,

5 right?

6                **MS. HATFIELD:**  Objection.  Form.

7      **A      Are you talking about the monies that were**

8 **coming to Matra USA account?**

9      Q      (By Mr. Johnson)  Yes.

10     **A      No, it was -- this money were used to pay its**

11 **own G&A, you know, pay it all, office lease, you know,**

12 **legal expenses and so on.  And expenses -- you know, the**

13 **company used to have and still having a lot of expenses**

14 **related to compliance.  Being a public company costs**

15 **money.**

16     Q      Does Matra USA, as we sit here today, have any

17 assets?

18     **A      Can you clarify what do you mean under**

19 **"assets"?  We have assets, you know, the leases; we have**

20 **fixed assets -- I mean, tables, computers or so on; and**

21 **we have assets cash.  What assets -- kind of assets are**

22 **you --**

23     Q      Any of those.  Does Matra USA have any of

24 those, any of those groups of assets?

25     **A      We have computers and desks and phones and --**

19

1    Q    Okay.  Does it have any of the leasehold

2 assets?

3    **A    No.  All assets are owned by different**

4 **companies -- Matra Oil & Gas and Matra Terra.**

5    Q    Does it have any cash assets as you sit here

6 today?

7    **A    As far as I know, C4 handles this.  As far as I**

8 **know, no.**

9    Q    Who handles this?

10    **A    C4, Chief Financial Officer, Selezneva.**

11    Q    Elena?

12    **A    Elena.**

13    Q    Okay.  Has the operating license been

14 transferred from Matra Operating?

15    **A    No.  You mean P5 operating as, you know, no.**

16    Q    That was something that y'all have been

17 considering, though, correct?

18    **A    No.**

19         **MS. HATFIELD:**  Objection.  Form.

20    **A    Me not.**

21    Q    (By Mr. Johnson)  Okay.  Let's take a look at

22 some documents then.

23    **A    We've been -- you know, let me clarify this.**

24 **We've been -- you know, the lenders, they asked us**

25 **several times to cut expenses.  And then, you know,**

Discovery Resource
713-223-3300

20

1  after, you know, I think in January or February, you

2  know, one of the options of restructuring was to

3  transfer operatorship of Matra from Matra Petroleum

4  Operating to different entities.  And, actually, this

5  was a request from Legacy Bank, and the Legacy Bank was

6  and is our secured lenders.  So they told us that Matra

7  is too expensive to operate the leases because of the

8  G&A expenses above the Matra Petroleum Operating level.

9  For that reason they would like to take operatorship out

10 of Matra USA.  And, you know, after this, I suggested to

11 Melody, you know, they need -- if they are going to

12 consider change in operatorship, they can use one of

13 their own companies to operate the leases.

14    Q    Then how would that work?  They'd operate the

15 leases, create the revenue and then pay you your royalty

16 interest?

17             MS. HATFIELD:  Objection.  Form.

18    A    They would -- I -- in this case, you know, they

19 would pay -- they would have -- you know, usually an

20 operation company has a budget, so called COPAS.  So

21 operation -- because operation company operates on

22 behalf of the asset owners and their costs.  So

23 basically it's like pass-through entity.

24             In this case Matra Oil & Gas and Matra

25 Terra would sign joint operation agreement with whoever

21

1 **would have been appointed the new operation, operation**

2 **company, and it was up to Matra Oil & Gas and Matra**

3 **Terra and the new operation company to define the terms.**

4 **So it wasn't up to me.**

5    Q    (By Mr. Johnson)  All right.  And then what I

6 believe you told me -- and I don't want to put words in

7 your mouth -- is that Melody was going to select the

8 operator?

9    **A    Melody together with Legacy.**

10    Q    Okay.

11    **A    Two secure lenders.**

12    Q    And were -- what is your understanding of what

13 that entity would look like just from your discussions

14 with them?

15    **A    No, my --**

16       **MS. HATFIELD:**  Objection.  Form.

17    **A    My personal opinion was to appoint -- it was**

18 **the company called Core Terra Operating, that is -- used**

19 **to be owned by Melody group of companies.  And I know**

20 **that Melody and Legacy, they met with several operators**

21 **in the Borger area, speak to them about potential**

22 **operatorship transfer from Matra Petroleum to them.  So**

23 **there have been maybe five or six different options for**

24 **candidates.**

25    Q    (By Mr. Johnson)  All right.

22

1                    (Exhibit 7 marked)

2      **A     Unless you understand that it's not my**

3  **decision, I have no power.  You know, the asset owners,**

4  **they decide who operate their assets.**

5                    **MS. HATFIELD:**  Wait until he asks the

6  questions.

7                    **THE WITNESS:**  Uh-huh.

8                    **MR. JOHNSON:**  Object to the nonresponsive

9  portions.

10                   **MS. HATFIELD:**  Wait until he asks the

11 questions.

12                   **THE WITNESS:**  Okay.

13                   **MS. HATFIELD:**  Okay?  Listen to the

14 question.

15                   **THE WITNESS:**  Okay.

16     Q    (By Mr. Johnson)  All right.  I've handed you

17 what's been marked --

18                   **MR. JOHNSON:**  And we're going to go in

19 sequential order from the last deposition, so.

20                   **THE WITNESS:**  Okay.

21                   **MS. HATFIELD:**  Okay.

22     Q    (By Mr. Johnson)  I've handed you what's been

23 marked as Exhibit 7 to your deposition.  Have you seen

24 this document before?

25     **A     I saw this from Mr. Lenskiy.  It was testimony**

23

1   **or --**

2      Q    Okay.

3      **A    -- filing and I -- uh-huh.**

4      Q    Okay.  You saw this attached to

5   Mr. Lenskiy's --

6      **A    Yes.**

7      Q    -- petition?  All right.

8      **A    Yes, sir.**

9      Q    Had you ever seen it prior to that?

10     **A    No, definitely not.**

11     Q    Okay.  Well, as I understand it, we're in a

12  period of forbearance right now with the lenders or

13  you-all are; is that fair?

14     **A    Oh.**

15          **MS. HATFIELD:**  Objection.  Form.

16     **A    I'm sorry.**

17     Q    (By Mr. Johnson)  As I understand it, you --

18  you, Matra have executed a Forbearance Agreement.

19     **A    Yes.**

20     Q    You're one of the parties to a Forbearance

21  Agreement.  And for how long does that Forbearance

22  Agreement stay in effect?

23          **MS. HATFIELD:**  Objection.  Form.

24     **A    For one month.**

25     Q    (By Mr. Johnson)  Okay.  I think that's right.

24

1  I think it's until May 26th, 2019.  Does that sound

2  about right?

3     **A     Yes, sir.**

4     Q     And we can get the precise dates.

5              And what is the purpose of that

6  Forbearance Agreement?

7              **MS. HATFIELD:**  Objection.  Form.

8     Q     (By Mr. Johnson)  From your perspective, what's

9  your -- what's your understanding for the purpose of

10 that agreement?

11    **A     Again, in --**

12             **MS. HATFIELD:**  I'm going to caution you

13 not to talk about anything you've talked about with the

14 lawyers, but if you can answer without --

15             **THE WITNESS:**  Okay.

16             **MS. HATFIELD:**  -- repeating

17 conversations --

18             **THE WITNESS:**  Okay.

19             **MS. HATFIELD:**  -- with the lawyers, go

20 ahead.

21    **A     So back to 2018, Matra failed on various**

22 **covenants of the loan agreement, resource based loan**

23 **agreement with Legacy, and Legacy had started back then**

24 **considering different options how to reduce the risk**

25 **exposure to this loan.  And, moreover, the loan is going**

1  to expire on September 30th.  So basically by

2  September 30, Matra will have either to repay this loan

3  or to find someone who is going to refinance it.

4                And as I already mentioned, the lenders,

5  they were not happy with the asset performance and with

6  the costs.  So, therefore, my understanding, they

7  started considering different options back to 2018 even,

8  what to do next.

9    Q    (By Mr. Johnson)  What is your understanding of

10 what the form of the contemplated reorganization would

11 be?

12               MS. HATFIELD:  Objection.  Form.  I'm

13 going to caution you the same way I did on the last

14 question.

15               THE WITNESS:  Okay.

16               MS. HATFIELD:  Tell him what you know, but

17 only what you know independently, not what you know from

18 talking with the lawyers.

19    A    You know, there are different options, but as I

20 said, you know, I saw just, you know, from this

21 presentation that they considered different options.

22    Q    (By Mr. Johnson)  And fair enough.  And take

23 your time and look at the presentation.

24    A    Uh-huh.

25    Q    Is this consistent -- what's in here is this

26

1 consistent with how you understand the transaction

2 that's being contemplated now?

3          **MS. HATFIELD:**  Objection.  Form.

4     **A     I really cannot answer this question because I**

5 **don't know what is the proposed restructuring is.  You**

6 **are talking about, you know, potential restructuring,**

7 **but I don't know the details.  I run operations on the**

8 **field, and I was brought to sign in, you know, the**

9 **Forbearance Agreement because we need it badly to get,**

10 **you know, this $500,000 to pay to vendors so -- so that**

11 **we keep operations -- operations going.  All the -- so I**

12 **haven't been part of any negotiations or terms of**

13 **potential restructuring.**

14     Q     (By Mr. Johnson)  Do you have an understanding

15 one way or the other that as a result of a contemplated

16 transaction, Matra USA would be merged into another

17 entity and cease to exist?

18          **MS. HATFIELD:**  Objection.  Form.

19     **A     It may be one of the options but --**

20     Q     (By Mr. Johnson)  Well, have you -- hold on.

21          Have you ever had any discussion along

22 that line with anyone --

23     **A     No.**

24     Q     -- from Melody?

25     **A     No, sir.**

1    Q    Does that concern you at all?

2         MS. HATFIELD:  Objection.  Form.

3    **A    You know, as we, Matra, in default, basically**

4 **we are not in the driving seat anymore.  Lenders are in**

5 **the driving seat.  So if there is no, some kind of**

6 **restructuring, Matra is going to default on Legacy loan.**

7 **So the longest time for the default is end of September.**

8 **So basically if nothing is done, the foreclosure is**

9 **going to happen on September 30th, and everyone is going**

10 **to lose.  The value --**

11   Q    (By Mr. Johnson)  And --

12   **A    -- will be gone.**

13   Q    And I appreciate that's your opinion.  My

14 question's a little bit differently.

15        Does it concern you that a proposed

16 transaction may get rid of Matra USA?

17        MS. HATFIELD:  Objection.  Form.

18   **A    No.**

19   Q    (By Mr. Johnson)  All right.  You're -- you're

20 Chief Executive Officer of Matra USA?

21   **A    Yes.**

22   Q    Right?

23   **A    Yes.**

24   Q    Okay.  But you haven't had any discussions

25 about the possible extinguishment of the very entity

1 you're the CEO of?

2              **MS. HATFIELD:**  Objection.  Form.

3    **A    But look at this:  There is right now**

4 **liabilities are much higher than the assets value.**

5 **Right now there is no value in the entire Matra group.**

6 **The Matra companies owe $70 million to secured lenders**

7 **and the value, the market value of the assets if you put**

8 **these assets onto market right now, it's maybe**

9 **$15 million.  So the value is already not there.**

10   Q    (By Mr. Johnson)  What is the PV10 valuation of

11 the reserves that you published to the public at the end

12 of 2018?

13    **A    This valuation -- you know, there is the market**

14 **valuation and -- and the risk valuation done or**

15 **performed by -- by consultants.**

16   Q    Okay.

17    **A    So the consultants think that our value is**

18 **$260 million, but the market thinks that this is a value**

19 **of $15 million.**

20   Q    All right.  Well, let's take a look at --

21    **A    Uh-huh.**

22   Q    -- Exhibit 3.

23    **A    It's like my house.  I think it's worth million**

24 **dollar, but, you know, how much I'm going to get for it.**

25   Q    Okay.  Let's look at what you-all published on

1 your own website and reported to the public in February

2 of 2019, and this is for the fourth quarter 2018.  Okay?

3          **MS. HATFIELD:**  Objection.  Form.

4     Q    (By Mr. Johnson)  Are you with me?

5          **MS. HATFIELD:**  Objection.  Form.

6     Q    (By Mr. Johnson)  All right.  Let's look at the

7 first page.

8     **A    When you say "you," not me, Matra Petroleum AB.**

9     Q    Okay.  But these if -- and I get you're trying

10 to make that distinction, but I think we established

11 earlier, the only assets -- assets of any of the Matra

12 entities are the leases in the Panhandle that are

13 oper -- operated by Operating, correct?

14          **MS. HATFIELD:**  Objection.  Form.

15    **A    Assets owned by Matra Oil & Gas.**

16    Q    (By Mr. Johnson)  Okay.  And that's what

17 generates revenue for Matra, right?

18          **MS. HATFIELD:**  Objection.  Form.

19    **A    Yes.**

20    Q    (By Mr. Johnson)  Okay.  And other than some

21 desks and telephones, Matra USA doesn't have any assets,

22 right?

23    **A    Right.**

24    Q    All right.  So if we go to Page 3 of Exhibit 3,

25 that's a description of the leases --

Discovery Resource
713-223-3300

30

1      **A**      **Uh-huh.**

2      Q      -- that are owned and operated by Oil & Gas and

3 Operating, correct?

4           **MS. HATFIELD:**  Objection.  Form.

5      **A**      **Yes, sir.**

6      Q      (By Mr. Johnson)  Those are the leases

7 referring to Matra globally that create revenue for

8 Matra, correct?

9           **MS. HATFIELD:**  Objection.  Form.

10     **A**      **Yes.**

11     Q      (By Mr. Johnson)  And then if we go to Page 4,

12 you'll see that there's a net -- it states here, "Net

13 present value (PV10) of proved net oil and gas reserves

14 as of 31 December 2018 increased by 75 percent to

15 265 million USD."  Did I read that correctly?

16           **MS. HATFIELD:**  Objection.  Form.

17     **A**      **Yeah, it's read like this, but you need to ask**

18 **about this valuation Mr. Indychko.  This is, you know, a**

19 **result of his work.**

20     Q      (By Mr. Johnson)  Okay.

21     **A**      **Uh-huh.**

22     Q      Well, let me ask you this:  It's on the

23 Matra AB website, which includes --

24     **A**      **I understand.**

25     Q      -- all the information for all the Matra

1 entities.

2    **A**   **I'm not --**

3    Q   At some point have you said, oh, hey, wait, we

4 probably shouldn't be publishing this to the world

5 because it's inaccurate?  Have you ever made that

6 objection?

7           **MS. HATFIELD:**  Objection.  Form.

8    **A**   **I didn't.**

9    Q   (By Mr. Johnson)  All right.

10    **A**   **But you need to ask this question to Matra CEO**

11 **and Mr. Indychko who was Chief Technical Officer of**

12 **Matra Petroleum USA and who produced this valuation.**

13    Q   Well, who's the highest ranking Matra executive

14 in the United States?  It's you, right?

15    **A**   **I -- since November.**

16    Q   All right.  So you don't think you have any

17 responsibility to check the results and the accuracy of

18 the documents that you-all are publishing on the

19 website?

20           **MS. HATFIELD:**  Objection.  Form.

21    **A**   **Also, this -- but this valuation is approved by**

22 **independent consultants.**

23    Q   (By Mr. Johnson)  And who are they?

24    **A**   **DeGolyer.**

25           **THE REPORTER:**  Can you say that again?

1          **THE WITNESS:**  It's --

2          **MS. HATFIELD:**  Do you want to write it?

3 Will that help?

4          **THE WITNESS:**  It's DeGolyer.  It's -- it's

5 a consultant company, engineering consultant company

6 from Dallas.

7          **MS. HATFIELD:**  Can you spell it for her?

8          **THE WITNESS:**  I don't remember how to

9 spell it because this is not --

10    Q    (By Mr. Johnson)  Is this the same

11 consultant --

12    **A    Yes.**

13    Q    -- that Ms. Selezneva referenced in her

14 deposition?  You were in here?

15    **A    Yes, yes.**

16    Q    Okay.

17          **MR. JOHNSON:**  Do you remember what the

18 name was?

19          **MS. HATFIELD:**  I don't.  I don't.

20          **MR. LENSKIY:**  I can say it.

21          **MR. JOHNSON:**  What is it?

22          **MR. LENSKIY:**  DeGolyer & MacNaughton.

23 DeGolyer & MacNaughton, D&M.

24          **MR. JOHNSON:**  D&M.

25    Q    (By Mr. Johnson)  We'll call it D&M.

1    **A      Okay.**

2    Q      D&M, does that work for you, Mr. Funygin?

3    **A      Yes, it does.**

4    Q      Okay.  And these are petroleum engineers?

5    **A      Yes, sir.**

6    Q      And where are they located?

7    **A      Dallas, Texas.**

8    Q      Do you find them to be reputable?

9    **A      Yes.**

10   Q      And as the -- as someone who works 95 percent

11   of the time in operations, what role did you have in

12   selecting D&M as your independent petroleum engineers?

13   **A      I didn't select them.  It was a task of our**

14   **Chief Technical Officer.**

15   Q      Okay.

16   **A      He has always been working with this same**

17   **company.**

18   Q      And as you sit here today, do you doubt the

19   accuracy of D&M's work?

20              **MS. HATFIELD:**  Objection.  Form.

21   **A      I'm talking about two different things.  You**

22   **know, this is the value of potential value given under**

23   **different assumptions of potential oil in the ground.**

24   **To produce it, it's a different story.  Oil there in the**

25   **ground and the value of these reserves is reflected in**

34

1  **this table.**

2    Q    (By Mr. Johnson)   Uh-huh.

3    **A    Whether or not they're going to be produced, no**

4  **one knows.   Oil price can go down tomorrow back to $20**

5  **or $30, and this value is going to evaporate.**

6    Q    Sure, and I appreciate that.   And I've

7  represented a lot of oil and gas companies over the

8  years, but this is one of the primary basis that drives

9  enterprise value, right?

10    **A    Yes.**

11          **MS. HATFIELD:**   Objection.   Form.

12    Q    (By Mr. Johnson)   For every oil and gas; fair?

13    **A    Yes.**

14    Q    I mean, the reserves, the reason you have to

15  have an independent petroleum engineer, especially when

16  shares are publicly traded, is to verify the accuracy of

17  the numbers in there, right?

18    **A    Yes.**

19          **MS. HATFIELD:**   Objection.   Form.

20    Q    (By Mr. Johnson)   And as CEO of Matra USA and

21  as an employee of CO -- Matra Operating, do you think

22  there's anything misleading to the public in this

23  document that you're publishing on your website?

24          **MS. HATFIELD:**   Objection.   Form.

25    **A    All I say, this is a theoretical value of**

1 **reserves in the ground.**

2    Q    (By Mr. Johnson)  Tell me about Melody's -- I

3 know they've issued debt.  I want to talk about their

4 equity holdings.  What equity, if any, do they own in

5 Matra USA, Matra Operating, Matra Oil & Gas?

6    **A    As far as I know, they own 333 shares of Matra**

7 **USA and about 10 percent of Matra AB.**

8    Q    All right.  And as we sit here today, I just

9 want to make sure as a result of the Standstill

10 Agreement and other things, there's been no filing for

11 bankruptcy by any of the Matra entities?

12    **A    No.**

13    Q    And as I understand it, Melody's interest and

14 yours is to keep Matra as a going concern; fair?

15           **MS. HATFIELD:**  Objection.  Form.

16    **A    It is.**

17    Q    (By Mr. Johnson)  To avoid bankruptcy?

18           **MS. HATFIELD:**  Objection.  Form.

19    **A    There are --**

20           **MS. HATFIELD:**  I'm going to -- pause for

21 just a second.

22           **THE WITNESS:**  Uh-huh.

23           **MS. HATFIELD:**  Don't talk about anything

24 you've talked about with the lawyers.

25           **THE WITNESS:**  Okay.

36

1           **MS. HATFIELD:**  If you have independent

2 knowledge, you can tell them about that, but if it

3 involves any discussion with lawyers, don't talk about

4 it.

5           **THE WITNESS:**  Okay.

6     **A     Can you repeat the question again?**

7     Q    (By Mr. Johnson)  Sure.  Melody and your

8 interest is to keep, as I understand at least from

9 statements made given the value of the reserves and

10 other things, to keep Matra as a going concern, correct?

11    **A     In the perfect world, yes.**

12    Q    Okay.  In a perfect world?

13    **A     Yes.**

14    Q    No one has invoked, as we sit here today, the

15 protections of bankruptcy court?

16           **MS. HATFIELD:**  Objection.  Form.

17    **A     I know that Maxim Barskiy's bound by an**

18 **agreement with Melody, and it was part of the loan**

19 **agreement we executed that Matra will not -- will not**

20 **file for bankruptcy because, otherwise, any company in**

21 **their financial situation and with the negative cash**

22 **flow we've had would have filed for bankruptcy**

23 **protection a long time ago, maybe not long time ago but,**

24 **you know, one year ago.**

25    Q    (By Mr. Johnson)  Right.  But that -- that

1 hasn't happened in this situation?

2    **A**   **It hasn't happened.**

3    Q   Okay.

4    **A**   **Because of Maxim Barskiy's personal commitment**

5 **not to file for bankruptcy.**

6    Q   Tell me about this agreement.  You said Maxim

7 Barskiy is a party to an agreement with Melody that he

8 will not file bankruptcy?

9    **A**   **I heard.  I didn't see this agreement.**

10    Q   Who did you hear it from?

11          **MS. HATFIELD:**  If the answer is lawyers,

12 stop talking about it.

13    **A**   **He told me himself, yeah.  And I told him why,**

14 **Max, you know, our -- our cash flow is negative, why we**

15 **don't fill for bankruptcy, and he said we cannot do**

16 **this.**

17    Q   (By Mr. Johnson)  Have you ever seen a copy of

18 this agreement?

19    **A**   **No.**

20    Q   Presumably Melody's got a copy of it, obviously

21 if they're a party to it?

22          **MS. HATFIELD:**  Objection.  Form.

23    **A**   **I don't know.**

24    Q   (By Mr. Johnson)  Did he tell you anything else

25 about the agreement, who has preferential rights and

38

1 whatnot under that agreement?

2    **A    No.**

3    Q    Now, Mr. Barskiy -- you told me Melody is a

4 10 percent shareholder of Matra AB.  So that -- that's

5 the equity in the Swedish company, right?

6    **A    Yes.**

7    Q    All right.  And the value of that equity is

8 driven by the Matra entities in the -- in the U.S.,

9 correct?

10    **A    No, it is --**

11        **MS. HATFIELD:**  Objection.  Form.  Go

12 ahead.

13    **A    It is driven by market, the market value.**

14 **Matra AB is a publicly traded company, so the market**

15 **sets up, you know, the value of the company,**

16 **representation of the company.**

17    Q    (By Mr. Johnson)  Right.  I understand there's

18 a market for the securities, but just like Exxon is

19 publicly traded, the value of those shares is driven by

20 its revenue and profitability, right?

21        **MS. HATFIELD:**  Objection.  Form.

22    **A    Yes.**

23    Q    (By Mr. Johnson)  Okay.  And, similarly,

24 Matra AB's price valuation is going to be driven by the

25 revenue of the Matra entities in the U.S., right?

39

1            **MS. HATFIELD:**  Objection.  Form.

2       **A     Yes.**

3       Q     (By Mr. Johnson)  That would be only assuming

4  that there's a rational investor, those are factors they

5  will look at in deciding whether to invest in Matra AB,

6  correct?

7       **A     Correct.**

8            **MS. HATFIELD:**  Objection.  Form.

9       Q     (By Mr. Johnson)  All right.  If Matra goes

10  into bankruptcy, the value of those Matra AB shares is

11  zero, correct?

12            **MS. HATFIELD:**  Objection.  Form.

13      **A     I assume, yes.**

14      Q     (By Mr. Johnson)  Yes.  All right.  How many

15  shares of Matra AB does Mr. Barskiy own?

16      **A     It is on website.**

17      Q     Well, if I represent to you that --

18            **MS. HATFIELD:**  Just tell him the number,

19  if you know.

20      Q     (By Mr. Johnson)  What is Rovelo?

21      **A     I assume they -- you know, I -- I haven't read,**

22  **you know, its Articles of Incorporation, but I assume**

23  **this is the company that is co-owned by Mr. Barskiy.**

24      Q     Okay.  Your personal understanding is that

25  Rovelo is co-owned by Mr. Barskiy, correct?

1          **MS. HATFIELD:**  Objection.  Form.  You can

2 answer.

3     Q    (By Mr. Johnson)  You can answer.

4     **A    Yes.**

5     Q    Yes.  All right.  And Rovelo, I'll represent to

6 you, owns roughly 50 percent of the publicly traded

7 shares of AB.  Does that sound about right?

8     **A    Yes, but as I see it from our own website.**

9     Q    Yeah, correct.  So if the company were to file

10 for bankruptcy, Mr. Barskiy would lose that -- the value

11 of the equities he owns via Rovelo; fair?

12          **MS. HATFIELD:**  Objection.  Form.

13     **A    Yes.**

14     Q    (By Mr. Johnson)  All right.  I'm going to hand

15 you what's been marked as Exhibit 2.

16          **MS. HATFIELD:**  I'm sorry.  I thought we

17 were going -- oh, this is the old Exhibit 2.

18          **MR. JOHNSON:**  Yeah, just keeping them

19 sequential.

20          **MS. HATFIELD:**  Got it.

21     Q    (By Mr. Johnson)  All right.  So if we look at

22 the second page here, which is where this -- this e-mail

23 string starts, are you with me?  On February 21st of

24 2019 at 5:32 p.m. you sent an e-mail.  Are you with me?

25     **A    5:32, yes.**

1    Q    All right.  And you write there, "You may need

2 to ask lawyers but, obviously, if Matra Operating Pays

3 for Invoices for Matra USA, it is much easier to prove

4 that these companies are directly related and in fact,

5 one business."  Did I read that correctly?

6    **A    Yes, you do.**

7    Q    All right.  And that is a true and correct copy

8 of what you wrote on February 21st, 2019, correct?

9    **A    I assume, yes.**

10    Q    Well, that -- you said you assume.  That is, in

11 fact, what you wrote, right?

12    **A    Yes.**

13    Q    And that's what you believed at the time,

14 correct?

15    **A    Uh-huh.**

16         **MS. HATFIELD:**  Objection.  Form.

17    Q    (By Mr. Johnson)  Is that a yes?

18    **A    Yes, this is my writing, yeah, my e-mail.**

19    Q    Now, if we go to the next page, there's another

20 e-mail from you to Ms. Selezneva on the same date or

21 February 21st, 2019, 8:48 a.m.  Okay?

22    **A    8 -- okay.  Yeah, 8:48.**

23    Q    Are you with me?

24    **A    Yes, yeah.**

25    Q    And it says you are a CFO, it starts.  Are you

42

1  with me?

2     **A     Yes.**

3     Q     All right.  And then you go on to state, "For

4  me it is clear that at this time (after the court has

5  issued the ruling) one cannot put any payments of

6  liabilities of Matra USA ahead of those ordered by the

7  court.  But, again, you need to consult with the

8  lawyers."  Did I read that correctly?

9     **A     Yes, it was my personal opinion.**

10    Q     Okay.  And that's what you wrote again on

11 February 21st, 2019?

12    **A     And, again, it was my personal opinion, and I**

13 **told her to consult lawyers.**

14    Q     Fine.

15          **MS. HATFIELD:**  Just listen to his

16 questions.  Just listen to his questions.

17    Q     (By Mr. Johnson)  How long have you been in the

18 oil and gas business?

19    **A     Since 1992.**

20    Q     So 27 years?

21    **A     Yes, about, with a break for getting my MBA**

22 **degree.**

23    Q     I'm sorry?  A break for getting your --

24    **A     MBA, graduate degree.**

25    Q     Your MBA degree?

43

1      **A     Uh-huh.**

2      Q     Okay.  From where did you get your MBA degree?

3      **A     From Rice.**

4      Q     And how about your undergrad education?

5      **A     It is from a military school in Russian.**

6      Q     Okay.

7      **A     And my second degree is in engineering from**

8 **University of Calgary.**

9      Q     All right.  So you went -- as I understand it,

10 you went to a military college --

11      **A     Yes.**

12      Q     -- in Russia?  And when did you graduate from

13 there?

14      **A     Oh, my God.  In 1989.**

15      Q     Time flies, huh?

16      **A     It does.**

17      Q     And then you got a Master's in engineering?

18      **A     Bachelor.**

19      Q     Bachelor of Engineering.  From where?

20      **A     University of Calgary.**

21      Q     That's right, University of Calgary.  And when

22 did you receive that?

23      **A     In 1993.**

24      Q     And then you got your MBA from Rice?

25      **A     Yes, sir.**

44

1    Q    And when did you receive your MBA?

2    **A    In 2002.**

3    Q    Okay.  So here, this e-mail is dated

4 February 2019.  Given your 27 years in the oil and gas

5 industry, your training as an oil and gas engineer and

6 your MBA from Rice, it was your opinion that one could

7 not put payments or liabilities of Matra USA ahead of

8 those ordered by the court, correct?

9    **A    Yes, I warned her about the risks.**

10    Q    And in the e-mail we looked at just a minute

11 ago, you also wrote that if Matra Operating pays for

12 invoices of Matra USA, it is much easier to prove that

13 these companies are directly related and in fact, I

14 quote, "one business," right?

15    **A    I wrote it, yes.**

16    Q    Yeah.  All right.  Thank you.

17         **MS. HATFIELD:**  Are we close to a breaking

18 time?

19         **MR. JOHNSON:**  Yeah, we can do a break

20 right now.

21         **THE VIDEOGRAPHER:**  It is 2:20 p.m.  We are

22 off the record.

23         (Recess from 2:20 p.m. to 2:30 p.m.)

24         **THE VIDEOGRAPHER:**  It is 2:30 p.m.  We are

25 back on record.

1    Q     (By Mr. Johnson)  All right, Mr. Funygin.

2 We're back on the record.  You mentioned earlier that

3 you were or you are, I should say, the COO of Matra

4 Operating and CEO of Matra USA?

5    **A     Yes.**

6    Q     Okay.  But what other titles do you hold, if

7 any?

8    **A     Before we signed the Forbearance Agreement, I**

9 **was told by our COO that I have to sign the Forbearance**

10 **Agreement on behalf of Matra Oil & Gas and the Terra.**

11    Q     Let's take a look at that.

12          (Exhibit 8 marked)

13          **MR. JOHNSON:**  I'm sorry.  I've only got

14 three copies.

15    Q     (By Mr. Johnson)  All right.  Can you identify

16 the document that I've handed to you as Exhibit 8?

17    **A     Yes.**

18    Q     And what are we looking at at Exhibit 8?

19    **A     Forbearance Agreement.**

20    Q     Okay.  And this is the same Forbearance

21 Agreement you just referenced in your testimony?  And

22 take your time.

23    **A     Yes.**

24    Q     Okay.  Now, if we flip to the back, you'll see

25 what we refer to as Bates numbers in the bottom

1 right-hand corner.

2     **A     Uh-huh.**

3     Q    Okay.  If you flip back to --

4     **A     Uh-huh.**

5     Q    -- 1879.

6     **A     18 --**

7          **MS. HATFIELD:**  It's in the bottom

8 right-hand corner.

9     Q    (By Mr. Johnson)  In the bottom right-hand

10 corner, do you see where it says MATRADEF00?

11     **A     Oh, okay.**

12     Q    And it will be 1879.

13     **A     Okay.  Here.  Yeah.**

14     Q    Okay.  And so here you're signing on behalf of

15 Matra Petroleum Oil & Gas, LLC as its Chief Executive

16 Officer and manager, correct?

17     **A     Yes, sir.**

18     Q    And is that one of your titles?

19     **A     Yes, I was told to sign as Matra.**

20     Q    Well, I understand you were told to sign this,

21 but do you have the title of Chief Executive Officer and

22 manager of Matra Petroleum Oil & Gas, LLC?

23          **MS. HATFIELD:**  Objection.  Form.

24     **A     I have no -- no agreement for this; I mean, no**

25 **labor agreement for this title, and I haven't seen a**

Discovery Resource
713-223-3300

1  **corporate resolution.  I was just told I need to sign as**

2  **Chief Executive Officer of Matra Petroleum Oil & Gas.**

3      Q    (By Mr. Johnson)  All right.

4      A    **Probably I was appointed, you know, back then.**

5      Q    Prior to executing this and being told to sign

6  this, you had no understanding that you were acting as

7  the Chief Executive Officer and manager of Matra

8  Petroleum Oil & Gas, did you?

9      A    **No.**

10     Q    All right.  Next page, Matra 1880.  Here you're

11 signing as Chief Executive Officer for Matra Petroleum

12 USA, correct?

13     A    **Yes.**

14     Q    All right.  Next page you're signing as Chief

15 Executive Officer and manager of Matra Terra, LLC,

16 correct?

17     A    **Yes.**

18     Q    Was this another instance in which you were

19 told to sign this document?

20     A    **Yes.**

21     Q    And you had no understanding prior to being

22 told to sign this document that you were a Chief

23 Executive Officer and manager of Matra Terra, LLC, did

24 you?

25     A    **You need to ask the president of the Board of**

48

1 **our -- Eric Forss, who is president of our Board.  He**

2 **may provide you with the copies of documents.**

3     Q    Well, I mean, that's great, and -- and --

4     **A    But best of my knowledge, no.**

5     Q    No.  Right.  I'm asking you --

6     **A    Yes.**

7     Q    -- did you have any knowledge at all that you

8 were acting as Chief Executive Officer or manager of

9 Matra Terra, LLC, prior to being told to sign this

10 document in that capacity?

11    **A    This is correct.**

12    Q    Next page.  Matra Petroleum Operating, LLC,

13 you're signing as Chief Executive Officer and manager,

14 correct?

15    **A    I think this is mistake and Chief Operating**

16 **Officer.  I think, you know, this is, you know, the**

17 **mistake.**

18    Q    All right.  Well, who is the Chief Executive

19 Officer of Matra Petroleum Operating?

20    **A    There is no such position.**

21    Q    Were you also told to sign as the Chief

22 Executive Officer of Matra Petroleum Operating when you

23 received the Forbearance Agreement?

24         **MS. HATFIELD:**  Objection.  Form.

25    **A    I have the right -- I have rights to sign on**

1 **behalf of Matra Petroleum Operating, so basically even**

2 **maybe didn't read, you know, the title.**

3    Q    (By Mr. Johnson)  And I appreciate that.  I'm

4 not picking on you.

5    **A    Uh-huh.**

6    Q    I'm wondering if someone instructed you to sign

7 this document on behalf of Matra Petroleum Operating?

8    **A    For -- for Matra Petroleum Operating, no.**

9 **There was --**

10    Q    Who instructed you to sign on behalf of the

11 other entities as Chief Executive Officer?

12         **MS. HATFIELD:**  Objection.  Form.

13    Q    (By Mr. Johnson)  You can answer.

14    **A    CEO of Matra Petroleum AB.**

15    Q    And who is that?

16    **A    Maxim Barskiy.**

17    Q    Do you have power of attorney on Matra

18 Operating?

19         **MS. HATFIELD:**  Objection.  Form.

20    **A    I -- I don't recall.**

21    Q    (By Mr. Johnson)  As you sit here today, do you

22 know one way or the other whether you have power of

23 attorney for Matra Operating?

24         **MS. HATFIELD:**  Objection.  Form.

25    **A    So it's been five years, so I should have, but,**

1 **you know, I am not certain.**

2    Q    (By Mr. Johnson)  So the answer is no, as you

3 sit here today, you do not know whether you have power

4 of attorney on behalf of Matra Operating?

5              **MS. HATFIELD:**  Objection.  Form.

6    **A    Right.**

7    Q    (By Mr. Johnson)  Okay.

8    **A    But I have a labor agreement, and in the labor**

9 **agreement, it's written what I need -- you know, my --**

10 **my responsibilities.**

11    Q    Okay.  I appreciate that.  Speaking of your

12 labor agreement, you came to Matra in 2013, right?

13    **A    End of.**

14    Q    Okay.  And when you came to Matra in 2013, your

15 employment agreement was actually with Matra USA, right?

16    **A    I don't remember.  I think it is -- it was**

17 **with -- I need to check.  I don't remember.**

18    Q    Okay.  Do you have any basis on which -- well,

19 I'll leave that.  We'll just ask for the agreement.

20 Okay?

21              When -- when are you certain that you

22 became or got an employment agreement with Matra

23 Operating?

24    **A    I think it was in January of 2014 when I**

25 **started running operations on the field.**

1    Q    Did you read the Forbearance Agreement before

2 executing it, or did you just sign it when Mr. Barskiy

3 told you it was okay --

4    **A    No.**

5    Q    -- to sign it?

6    **A    I read it.**

7    Q    Anything stick out to you when you read it?

8              **MS. HATFIELD:**  Objection.  Form.

9    **A    No.**

10    Q    (By Mr. Johnson)  When you read it, on behalf

11 of what entity were you reading the agreement?

12              **MS. HATFIELD:**  Objection.  Form.

13    **A    On behalf of Matra Petroleum Operating.**

14    Q    (By Mr. Johnson)  Anyone else?

15    **A    I'm on payroll of Matra Petroleum Operating.**

16    Q    Okay.

17    **A    And I have always been on the payroll.**

18    Q    I understand.  But you signed this document on

19 behalf of Matra Petroleum, Matra USA --

20    **A    Uh-huh.**

21    Q    -- Matra Terra and Matra Operating, right?

22    **A    Yes.**

23    Q    So how did you distinguish when you were

24 reading this document what role were -- what hat were

25 you wearing?

52

1           **MS. HATFIELD:**  Objection.  Form.

2      Q    (By Mr. Johnson)  Were you wearing your

3  Operating hat, your USA hat?

4      **A    What is the difference?  Can --**

5      Q    Your Oil & Gas hat?

6      **A    Can you explain the difference of what --**

7      Q    I don't think there is a difference.  I'm

8  asking you to describe for me the difference.

9      **A    For me there was no difference.**

10           **(Exhibit 9 marked)**

11     Q    (By Mr. Johnson)  Okay.  I'm going to hand you

12  what's been marked Exhibit 9.

13          All right.  You'll see this is an e-mail

14  from yourself to Mr. Barskiy dated March 7th, 2019,

15  correct?

16     **A    Yes.**

17     Q    Let me ask you this:  When is the last time you

18  talked to Mr. Barskiy?

19           **THE WITNESS:**  When was TRO amended?

20           **MS. HATFIELD:**  I can't answer any

21  questions.  Just what you remember.

22     **A    It was last week when TRO was amended.**

23     Q    (By Mr. Johnson)  Okay.

24     **A    So I called him and I told him that we can**

25  **operate as normal until the hearing.**

1     Q     And where was he located when you talked to

2  him?

3     **A     I don't know.**

4     Q     Did he indicate where he was?

5          **MS. HATFIELD:**  Objection.  Form.

6     **A     You know, in Russia they have like two weeks of**

7  **holidays.**

8     Q     (By Mr. Johnson)  Right.

9     **A     And no one works for the first two weeks of**

10 **May.  I assume he was traveling somewhere.**

11    Q     All right.  Traveling somewhere from Russia?

12         **MS. HATFIELD:**  Objection.  Form.

13    **A     In Russia or outside.  I don't know.  I don't**

14 **know.**

15    Q     (By Mr. Johnson)  If you'll look down,

16 there's -- here you write there, "Below are some issues

17 Melody has to think about."  Are you with me?

18    **A     Uh-huh.**

19    Q     It says, "One phone call to TRRC" -- that's

20 Texas Railroad Commission -- "May shut down most of our

21 gas leases as they are not in compliance with gas/oil

22 ratio.  Billy knows all" the "tricks how to make us

23 going."  Did I read that correctly?

24         **MS. HATFIELD:**  Sorry.  Do you not see

25 where he is?

54

1    Q    (By Mr. Johnson)  It's the third --

2              **MS. HATFIELD:**  It's in the --

3    Q    (By Mr. Johnson)  -- dash down.  It starts with

4  one phone call.

5              **MS. HATFIELD:**  One phone.  Do you see it?

6    **A    Okay.  I see it, yeah.**

7    Q    (By Mr. Johnson)  It says, "One phone call to

8  TRRC May shut down most of our gas leases as they are

9  not in compliance with gas/oil ratio.  Billy knows all

10  these tricks how to make us going."  Did I read that

11  correctly?

12    **A    Yes, you are.**

13    Q    Okay.  So what -- what is the issue that's

14  being referenced here in that -- in that bullet point?

15    **A    First of all, this is exaggeration, and the**

16  **tricks, I mean, and the paperwork that we need to file**

17  **with Texas Railroad Commission.**

18    Q    Who's Billy?

19    **A    Our operating manager.**

20    Q    Now, this document also talks about a new

21  operating company, right?

22    **A    Yes, sir.**

23    Q    All right.  And is this the same concept we

24  discussed earlier with Melody coming in and assigning

25  the new operator that possibly they own?

55

1          **MS. HATFIELD:**  Objection.  Form.

2     **A    Yes, sir.  Not only Melody, but more it was**

3 **mainly agreement by Legacy.**

4     Q    (By Mr. Johnson)  Well, let me -- let me frame

5 the question a little bit better.  Okay?

6          So this is March 7th, 2019, just a couple

7 of months ago.  What -- what is being discussed?  You're

8 relaying to Mr. Barskiy some issues that Melody needs to

9 think about.  Are you having discussions with Melody at

10 this point?

11          **MS. HATFIELD:**  Objection.  Form.

12     **A    Let me -- let me go back to -- as I already**

13 **told beginning maybe February they started looking for a**

14 **different operator -- I mean, Melody and Legacy.**

15     Q    (By Mr. Johnson)  Uh-huh.

16     **A    And they told us that they're not -- they're**

17 **not happy with Matra Petroleum Operating, and because of**

18 **the breach of covenants, they have the right to appoint**

19 **a new operator or even Legacy told us that they can take**

20 **all cash flow from Matra Petroleum Operating to -- to**

21 **Melody.**

22     Q    Okay.  I'm just asking about the -- the new

23 operator that's being referenced in this document.  Is

24 this the same concept that we discussed earlier about

25 Melody and Legacy coming in and assigning a new

1 operator, potentially one that they own?

2                 **MS. HATFIELD:**  Objection.  Form.

3     Q     (By Mr. Johnson)  You can answer.

4     **A     Yes.**

5                 **(Exhibit 10 marked)**

6     Q     (By Mr. Johnson)  All right.  I'm going to hand

7 you what's been marked as Exhibit 10 to your deposition.

8 All right.  Could you identify this document for me,

9 please?

10    **A     Yes, this is my e-mail.**

11    Q     Okay.  This is one of your e-mails, correct?

12    **A     Yes.**

13    Q     And you are forwarding -- the first e-mail at

14 the top of the page, you are forwarding Mr. Lenskiy's

15 petition for enforcement of a foreign judgment filed on

16 April 5th to Blake Yaralian, correct?

17    **A     Yes.**

18    Q     All right.  And who is Blake Yaralian?

19    **A     He is VP of Melody Capital Partners.**

20    Q     And I noticed in the document of production

21 there's a fair number of e-mails between you and him.

22 How much contact do you keep with Mr. Yaralian?

23                 **MS. HATFIELD:**  Objection.  Form.

24    **A     Until maybe mid of 2018, it hadn't been many**

25 **communications between us, but as we failed to comply**

57

1  **with several covenants of the loan agreements and**

2  **basically, you know, we were in default, they started**

3  **paying closer attention to our operations.  They wanted**

4  **to gather more information on our operations and cash**

5  **flow and our budgets and the costs.  So it was maybe**

6  **every other week --**

7      Q    (By Mr. Johnson)  Okay.

8      **A    -- you know, conference calls --**

9      Q    So --

10     **A    -- and --**

11     Q    Right.  So since 2018, you would say about

12 every other week you were having some form of

13 communication with Mr. Yaralian?

14     **A    (Moving head up and down.)**

15     Q    Is that --

16     **A    Yes.**

17     Q    -- a yes?

18     **A    Yes.**

19     Q    And the purpose of that communication is to

20 keep him up to speed with everything that's going on

21 including the Lenskiy judgment, correct?

22     **A    The Len --**

23          **MS. HATFIELD:**  Objection.  Form.  Go

24 ahead.

25     **A    In -- in the normal course of business, because**

58

 1  **Melody lended us all $13 million to drill 24 wells in**

 2  **2018, in accordance with the loan agreement we had to**

 3  **provide them operational update and the cost updates on**

 4  **how money were being spent.  And on this particular**

 5  **case, I received this document or this e-mail with**

 6  **attachment from Justin Renshaw, who used to be our**

 7  **region agent, so all documents were coming to him.**

 8      Q    (By Mr. Johnson)  Right.  And you were -- so he

 9  was aware of what was going on with the Lenskiy

10  judgment?

11      **A    Yes.**

12      Q    Right?

13           **MS. HATFIELD:**  Objection.  Form.

14      Q    (By Mr. Johnson)  And in this first e-mail you

15  write to him -- and I'm starting with the second

16  sentence where it says "since Matra USA."  Are you with

17  me?

18      **A    Yes.**

19      Q    "Since Matra USA owns nothing except shares of

20  Matra Operating and Matra Oil & Gas, I think, Lenskiy is

21  going to ask the judge or the marshals to seize these

22  shares and change their ownership in his favor.  Then

23  Lenskiy would own both companies and can change

24  management and make orders for money/assets transfer,

25  et cetera."  Did I read that correctly?

1     **A**    **Yes.**

2     Q    And that is what you wrote to Mr. Yaralian on

3 April 9th, 2019; fair?

4     **A**    **Yes.**

5     Q    All right.  And then the next paragraph you

6 state, "This is what I would have done if I were him.  I

7 would also ask the judge to freeze any assets/cash owned

8 by Matra Operating and Matra Oil & Gas."  Did I read

9 that correctly?

10    **A**    **Yes.**

11    Q    All right.  So at this point in time you are

12 CEO of Matra USA, correct?

13    **A**    **(Moving head up and down.)**

14    Q    Is that a yes?

15    **A**    **Yes.**

16    Q    And you're the highest ranking official, to the

17 extent there's a distinction, in Matra Operating, right?

18    **A**    **Yes.**

19    Q    You signed the Forbearance Agreement on behalf

20 of several Matra entities, correct?

21    **A**    **Yes.**

22    Q    Okay.

23         **MS. HATFIELD:**  Objection.  Form.

24    Q    (By Mr. Johnson)  And you're saying that on

25 April 9th that this is what you would have done if you

1 were him, right?

2    **A   Yes, this is my projection what anyone would do**

3 **in this situation.**

4    Q   Sure.  So you don't think he's being

5 unreasonable, do you --

6           **MS. HATFIELD:**  Objection.  Form.

7    Q   (By Mr. Johnson)  -- in seeking protection of

8 his judgment?

9    **A   I -- I haven't been thinking about him.  It was**

10 **thinking about me what I would have been doing.**

11    Q   Fair enough.  Fair enough.

12           And then in the last paragraph, you say,

13 "A question, is Melody still owning Core Terra

14 Operating?  Has" -- "Has not it been fully liquidated?

15 Perhaps you and Max need to agree to transfer

16 operatorship from Matra Petroleum Operating to Core

17 Terra Operating to avoid potential cash flow freeze or

18 seizure.  The next question for Max, you and lawyers is

19 how to protect assets owned by Matra Oil & Gas.

20 Basically, we have only 20 days to build defense."  Did

21 I read that correctly?

22    **A   Yes, you do.**

23    Q   Okay.  Was the Operating -- operatorship, has

24 it been transferred as of yet for Matra Petroleum

25 Operating?

1            **MS. HATFIELD:**  Objection.  Form.

2     **A     No.**

3     Q     (By Mr. Johnson)  Okay.  But as we discussed

4 earlier, one of the terms of the potential restructuring

5 is to change the operatorship, correct?

6            **MS. HATFIELD:**  Objection.  Form.

7     **A     The lenders have the right to appoint a new**

8 **operator.**

9     Q     (By Mr. Johnson)  Okay.  So my answer is, yes,

10 one of the terms of the proposed restructuring is to

11 change the operatorship, correct?

12    **A     It is --**

13           **MS. HATFIELD:**  Objection.  Form.

14    **A     It is one of potential options.**

15    Q     (By Mr. Johnson)  Okay.  The lenders do not

16 have to change the operatorship, do they?

17    **A     You are right.**

18    Q     Now, you mentioned Melody funding capex in

19 2018?

20    **A     All the capex, yes.**

21    Q     And how much was that?

22    **A     Based on the slides we all saw, it was**

23 **$13 million.**

24    Q     And that all went to the drilling of new wells,

25 correct?

62

1    **A    It went first to Matra USA, and then Matra USA**

2  **funded wells, new wells in accordance with approved**

3  **budget.**

4              **(Exhibit 11 marked)**

5              **MS. HATFIELD:**  Can you --

6              **MR. JOHNSON:**  Excuse me.  I'm sorry.  Bad

7  throw.

8    Q    (By Mr. Johnson)  All right.  I've handed you

9  what's been marked as Exhibit 11 to your deposition.

10 Can you identify this document?

11   **A    Yes.**

12   Q    What are we looking at here at Exhibit 11?

13             **MS. HATFIELD:**  Objection.  Form.

14   **A    My e-mail to Melody.**

15   Q    (By Mr. Johnson)  All right.  And so this was

16 sent on April 10th, 2019, correct?

17   **A    Yes.**

18   Q    You state to Mr. Yaralian, "As an interim stage

19 that can be done in one day if Matra AB agrees, shares

20 of Matra Operating and Matra Oil & Gas can be sold to a

21 third party."  Did I read that correctly?

22   **A    Yes, you do.**

23   Q    All right.  And then if we go to the next

24 paragraph, it states, "Or since Matra Oil & Gas assets

25 are collaterals for the loan, at least Matra Operating

1  shares should be sold off to avoid potential revenue

2  freeze."  Did I read that correctly?

3      A    Yes.

4      Q    Okay.  Have either of those things been done?

5      A    No.

6      Q    Okay.  But that is part of the contemplated

7  restructuring --

8      A    No.

9      Q    -- that the parties are considering now?

10     A    No.  It was -- because neither of this company

11 was apart of the lawsuit or arbitration and, you know,

12 my suggestion was to look at the different options.

13     Q    Okay.  One of the things you recommended was to

14 sell off the shares.  Why?

15          MS. HATFIELD:  Objection.  Form.

16     A    Shares.  Let me see.  Just to change it up.

17 They own the share of Matra Operating, and Matra

18 Operating owns no assets.  It operates the assets.

19     Q    (By Mr. Johnson)  Well, you state in the last

20 clause there on the top e-mail, you say, "At least Matra

21 Operating shares should be sold off to avoid potential

22 revenue freeze."

23     A    Uh-huh.

24     Q    What would be the purpose of selling those

25 shares off other than to try to frustrate Mr. Lenskiy's

1 judgment?

2    **A**   **But --**

3         **MS. HATFIELD:**  Objection.  Form.

4    **A**   **But, again, Matra Petroleum Operating wasn't**

5 **part of the legal action back then.**

6    Q   (By Mr. Johnson)  My question's different.  Why

7 are you recommending to sell those shares?

8         **MS. HATFIELD:**  Objection.  Form.

9    **A**   **To protect operations.**

10    Q   (By Mr. Johnson)  From what?

11    **A**   **From what?**  **From the -- from the cash flow**

12 **freeze because --**

13    Q   Which is from what?  From Mr. Lenskiy's

14 judgment, right?

15         **MS. HATFIELD:**  Objection.  Form.

16    **A**   **Maybe.**

17    Q   (By Mr. Johnson)  Maybe?

18    **A**   **Because, again, you know, he -- you know, Matra**

19 **Petroleum Operating until recently hadn't been a part of**

20 **the legal action.**

21    Q   All right.  Well, let's look down below.  Below

22 you'll see, if you go two e-mails down, you say, "Blake,

23 Max said he already forwarded this document to you."

24    **A**   **Yes.**

25    Q   Right?  And what is being forwarded to him is

65

1  the petition for enforcement of a foreign judgment,

2  correct?

3     **A    Yes.**

4     Q    And that's Mr. Lenskiy's judgment, right?

5     **A    Yes.**

6     Q    All right.  So you're recommending the selling

7  of shares because of Lenskiy's judgment, correct?

8              **MS. HATFIELD:**  Objection.  Form.

9     **A    Ultimately, yes.**

10    Q    (By Mr. Johnson)  Okay.  Thank you.

11            All right.  In the e-mail we were just

12 looking at, which I believe is exhibit what, 11?

13    **A    Uh-huh.**

14    Q    In the middle e-mail you forward the

15 domestication of judgment to Mr. Yaralian at Melody, and

16 then he says, "I'll call you in about an hour," right?

17 I mean, it's in there.

18    **A    Yes.**

19    Q    I'm just reading the e-mail.

20    **A    Yes.**

21    Q    Okay.

22    **A    Yes.**

23    Q    What did y'all talk about?

24            Well, first of all, did he call you back?

25    **A    As far as I remember, yes, we spoke.**

66

1    Q    All right.  And what did y'all talk about?

2    **A    I just informed him that we received, you know,**

3  **this judgment.  Even though it is not against Matra**

4  **Petroleum Operating, if I were Mr. Lenskiy, I would go**

5  **with this judgment to our purchasers of oil and gas**

6  **trying to freeze our cash flow.  And in this case, the**

7  **operations would stop and very quickly we would lose all**

8  **the value.**

9    Q    Yeah.  And then I take it in that call, you and

10  Mr. Yaralian talked about possible restructurings to

11  avoid any detrimental effect of the judgment?

12    **A    No.**

13          **MS. HATFIELD:**  Objection.  Form.

14    Q    (By Mr. Johnson)  Okay.  What else did y'all

15  talk about?

16    **A    No, I just informed him about this.**

17    Q    That's it?  What did he say in response?

18    **A    He said, you know, they're going to discuss**

19  **this internally.**

20    Q    Okay.  When is the next time you talked to

21  Mr. Yaralian?

22    **A    I think after that I hadn't spoken to him.**

23    Q    This is the last time you spoke to him?

24    **A    What day is what?**

25    Q    April 10th --

1    **A    April?**

2    Q    -- 2019.

3    **A    Oh, no.  Maybe -- maybe I spoke to him -- well,**

4 **I can look at my phone.**

5    Q    That's fine.

6          **MS. HATFIELD:**  No, no, no, no, no.

7          **THE WITNESS:**  Yeah.

8          **MS. HATFIELD:**  Stay seated.

9          **THE WITNESS:**  Okay.

10    Q    (By Mr. Johnson)  Do you keep a calendar on

11 your phone?

12    **A    No, it's my calls, you know.**

13    Q    Okay.  So you have a record --

14    **A    My received calls.**

15    Q    -- of who you've talked to --

16    **A    Not all.**

17    Q    -- on your phone?

18    **A    Not all, but, you know, some.**

19    Q    Yeah.  But there will be a record of the last

20 time you spoke to Mr. Yaralian, correct?

21    **A    No, I'm not saying this.**

22    Q    Okay.  Well, when we're done with your

23 deposition, will you search your phone and find the last

24 time, if it exists, that you spoke to Mr. Yaralian --

25          **MS. HATFIELD:**  No, we --

68

1    Q    (By Mr. Johnson)  -- and provide it to your

2 attorneys?

3            **MS. HATFIELD:**  You can make a written

4 request for documents, and we'll consider it and respond

5 accordingly in the amount of time --

6            **MR. JOHNSON:**  It's responsive to our

7 request.

8    Q    (By Mr. Johnson)  Can you do that?  Are you

9 physically able to do that, sir?

10   **A    I don't know.  You know, I need to see.**

11   Q    All right.  Okay.  What was the -- what was the

12 first event of default under the loan agreements that

13 led to the Forbearance Agreement?

14   **A    Lower production, lower revenue and lower**

15 **EBITDA.**

16   Q    Okay.  Was Mr. Lenskiy's judgment an event of

17 default?

18           **MS. HATFIELD:**  Objection.  Form.

19   **A    In my opinion, yes.**

20           **MR. JOHNSON:**  Okay.  All right.  Thank

21 you.  I'll pass the witness.

22           **MS. KLINGENSMITH:**  We'll save it.  Reserve

23 until time of trial.

24           **MS. HATFIELD:**  Reserve for Friday.

25           **THE VIDEOGRAPHER:**  This concludes the

69

1 deposition.  The time is 2:59 p.m.  We are now off the

2 record.

3                  (Proceedings concluded at 2:59 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

1                    CHANGES AND SIGNATURE

2    **WITNESS NAME:**  SERGEY FUNYGIN        DATE:  MAY 15, 2019

3    PAGE      LINE           CHANGE           REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1  I, SERGEY FUNYGIN, have read the foregoing deposition

2  and hereby affix my signature that same is true and

3  correct, except as noted above.

4

5

6                                    _____

                                     SERGEY FUNYGIN
7

8

9

10  THE STATE OF _____ )

11  COUNTY OF _____ )

12  Before me, _____, on this
    day personally appeared SERGEY FUNYGIN, known to me (or
13  proved to me under oath or through
    _____)(description of identity card
14  or other document)) to be the person whose name is
    subscribed to the foregoing instrument and acknowledged
15  to me that they executed the same for the purposes and
    consideration therein expressed.
16

17  Given under my hand and seal of office this _____ day
    of _____, _____.
18

19  NOTARY PUBLIC IN AND FOR THE STATE OF _____

20

21

22

23

24

25

72

1                      CAUSE NO. 2019-31055

2  VLADIMIR LENSKIY,              )   IN THE DISTRICT COURT OF
        Plaintiff,                )
3
   VS.                            )   HARRIS COUNTY, T E X A S
4
   MATRA PETROLEUM USA, INC.;     )
5  MATRA PETROLEUM OIL & GAS      )
   LLC; MATRA PETROLEUM           )
6  OPERATING LLC; MATRA TERRA     )
   LLC; MELODY CAPITAL            )
7  MANAGEMENT, LLC; MAXIM         )
   BARSKIY                        )
8      Defendants.                )   157TH  JUDICIAL DISTRICT

9                 REPORTER'S CERTIFICATION
      ORAL AND VIDEOTAPED DEPOSITION OF SERGEY FUNYGIN
10                    MAY 15, 2019

11 I, Wendi Broberg, Certified Shorthand Reporter in and
   for the State of Texas, hereby certify to the following:
12
   That the witness, SERGEY FUNYGIN, was duly sworn by the
13 officer and that the transcript of the oral deposition
   is a true record of the testimony given by the witness;
14
   That the deposition transcript was submitted
15 on _____, _____ to the witness
   or to the attorney for the witness for examination,
16 signature and return to me by
   _____, _____;
17
   That the amount of time used by each party at the
18 deposition is as follows:

19    MR. LOGAN E. JOHNSON - 01 Hour(s) :15 Minute(s)
      MS. HEATHER K. HATFIELD - 00 Hour(s) :00 Minute(s)
20    MS. ELIZABETH KLINGENSMITH - 00 Hour(s) :00 Minute(s)
      MR. ROBERT SCOTT - 00 Hour(s) :00 Minute(s)
21    MR. R. BLAKE RUNIONS - 00 Hour(s) :00 Minute(s)

22 That pursuant to information given to the deposition
   officer at the time said testimony was taken, the
23 following includes counsel for all parties of record:

24    Mr. Logan E. Johnson, Attorney for Plaintiff Vladimir
      Lenskiy
25

73

1    Ms. Heather K. Hatfield, Mr. R. Blake Runions,
     Attorneys for Defendants Matra Petroleum USA, Inc.;
2    Matra Petroleum Oil & Gas LLC; Matra Petroleum
     Operating LLC; Matra Terra LLC
3
     Ms. Elizabeth F. Klingensmith, Mr. Robert Scott,
4    Attorneys for Defendant Melody Capital Management,
     LLC
5
I further certify that I am neither counsel for, related
6 to, nor employed by any of the parties or attorneys in
the action in which this proceeding was taken, and
7 further that I am not financially or otherwise
interested in the outcome of the action.
8
Further certification requirements pursuant to Rule 203
9 of TRCP will be certified to after they have occurred.

10 Certified to by me this 16th day of May, 2019.

11

12

13          _____
            WENDI BROBERG, CSR 7091
14          Expiration Date:  12/31/19
            Discovery Resource
15          1511 West 34th Street
            Houston, Texas  77018
16          Ph. (713) 223-3300
            Fax (713) 228-3311
17

18

19

20

21

22

23

24

25

74

1   FURTHER CERTIFICATION UNDER RULE 203 TRCP

2 The original deposition was/was not returned to the
deposition officer on _____;

3

If returned, the attached Changes and Signature page
4 contains any changes and the reasons therefor;

5 If returned, the original deposition was delivered to
Mr. Logan E. Johnson, Custodial Attorney;

6

That $_____ is the deposition officer's
7 charges to Mr. Logan E. Johnson, Counsel for Plaintiff,
for preparing the original deposition transcript and any
8 copies of exhibits;

9 That the deposition was delivered in accordance with
Rule 203.3, and that a copy of this certificate was
10 served on all parties shown herein on and filed with the
Clerk.

11

Certified to by me this _____ day of _____,
12 _____.

13

14

15

    _____
16    WENDI BROBERG, CSR 7091
    Expiration Date:  12/31/19
17    Discovery Resource
    1511 West 34th Street
18    Houston, Texas  77018
    Ph. (713) 223-3300
19    Fax (713) 228-3311

20

21

22

23

24

25